Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>v.<br><br><br>JETSAN Y. ROSARIO MARTÍNEZ<br><br>Apelante | KLAN202200611 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Casos núm.: ISCR201900741, ISCR201900742, ISCR201900743, ISCR201900744, ISCR201900745, ISCR201900747<br><br>Sobre: Art. 93D 1er grado y Art. 93D Tentativa 1 grado del Código Penal de 2012 y Art. 5.04 al 5.15 y 6.01, Ley 404 Ley de Armas |
|---|---|---|

Panel especial integrado por su presidente, el juez Rivera Torres, el juez Salgado Schwarz y la juez Aldebol Mora[1].

Aldebol Mora, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 12 de mayo de 2025.

Comparece ante nos la parte apelante, Jetsan Y. Rosario Martínez, y nos solicita que revoquemos las sentencias dictadas en su contra por el Tribunal de Primera Instancia, Sala Superior de Mayagüez, el 28 de junio de 2022. Mediante dichos dictámenes, el foro primario condenó al apelante a ciento sesenta y un (161) años de cárcel por la comisión de varios delitos imputados.

Por los fundamentos que exponemos a continuación, se confirman las *Sentencias* apeladas. Veamos.

---

[1] Mediante Orden Administrativa OATA-2023-001 del 9 de enero de 2023, se designó a la Hon. Waleska Aldebol Mora en sustitución del Hon. Roberto Sánchez Ramos.

**I**

Por hechos ocurridos el 29 de abril de 2019, el Ministerio Público presentó acusaciones en contra de Jetsan Y. Rosario Martínez (Rosario Martínez o apelante) por la alegada comisión de los siguientes delitos: un (1) cargo por asesinato en primer grado, según tipificado en el Artículo 93 (d) del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5142 (Código Penal de 2012); un (1) cargo por tentativa de asesinato, según tipificado en el Artículo 93 (d) del Código Penal de 2012, *supra*; dos (2) cargos por la portación y el uso de armas de fuego sin licencia, según lo tipifica el Artículo 5.04 de la Ley Núm. 404-2000, según enmendada, conocida como la *Ley de Armas de Puerto Rico*, 25 LPRA sec. 458c (Ley de Armas de 2000); dos (dos) cargos por el Artículo 5.15 de la Ley de Armas de 2000, 25 LPRA sec. 458n, por disparar o apuntar un arma de fuego; y dos (2) cargos por la posesión de municiones, según tipificado en el Artículo 6.01 de la Ley de Armas de 2000, 25 LPRA sec. 459.[2]

Culminados los trámites procesales de rigor, se celebró un juicio por jurado los días 13, 14, 15, 16, 17 y 27 de septiembre de 2021; 4 de noviembre de 2021; y 7, 8, 9, 10, 14, 15 y 16 de marzo de 2022. La prueba del Ministerio Público consistió en prueba documental y testifical. Los testigos de cargo fueron: el agente Eduardo Quiñonez, el agente Obed Irizarry Seda, el agente Julio Rosado Barreto, el agente Nelson González Quiñones, Jean M. Vázquez Mendoza, Welgins Silva Angleró, Andrés González Ortiz, Cristal Marie Cruz Marrero, Ángel Torres Negrón, Ashley Michelle Silva Flores, Christian Rivera Torres, el doctor Juan E. Méndez

---

[2] Véase, *Acusación* de los autos originales de los casos, ISCR201900741(Tomo I), ISCR201900742, ISCR201900743, ISCR201900744, ISCR201900745, ISCR201900747. Aclaramos que, de los autos originales antes señalados, surge que también se le acusó a Rosario Martínez por otros delitos en los casos ISCR201900746 e ISCR201900748. Sin embargo, no contamos con los autos originales de los últimos dos.

Cervera (perito), Emilio Oscar Lozada Nazario, Luis A. Seguí Serrano, Jerry Bulgado De Jesús (perito) y Alex Cintrón Castellano.

Por otro lado, cabe aclarar que las partes estipularon que no declararían en el juicio los siguientes testigos: el paramédico Orlando Mercado, el paramédico Víctor A. Miranda, el agente José L. Montalvo, el doctor Juan Vivo Prieto, el doctor Jorge Hernández Zucarichi, el doctor Ernesto Núñez Mugler y la técnico de control y custodia de evidencias de ciencias forenses, Ana Abigail Torres.[3] Estas personas figuraban como testigos de cargo en el pliego acusatorio. Sin embargo, las partes determinaron que sería prueba acumulativa.

A continuación, resumiremos los aspectos relevantes de los testimonios de los testigos del Ministerio Público.

### **Agente Omar Quiñones Camacho**

El desfile de la prueba comenzó con el testimonio del agente Omar Quiñones Camacho (Quiñones Camacho) del Negociado de la Policía de Puerto Rico (Policía). A preguntas del Ministerio Público, este indicó que estaba adscrito a la División de Servicios Técnicos del CIC de Mayagüez.[4] Asimismo, narró que, el 29 de abril de 2019, mientras se encontraba en turno, entre las 10:00 p.m. y 10:15 p.m., el centro de mando solicitó su presencia en una escena de un asesinato en el área de San German, frente al residencial El Recreo, para poder trabajar la escena.[5] También mencionó que, cuando se personó al lugar de los hechos, encontró un vehículo marca Toyota, color azul, cerca de la verja del residencial El Recreo, en cuyo interior estaba el cuerpo sin vida de un joven en el área del conductor.[6] Detalló que dicho vehículo se encontraba lleno de impactos de balas.[7]

---

[3] Transcripción de Instrucciones al Jurado (TIJ), pág. 4.
[4] Transcripción de la Prueba Oral (TPO), pág. 8.
[5] Íd., pág. 9.
[6] Íd., págs. 9-10.
[7] Íd., pág. 10.

El agente Quiñones Camacho testificó que había entrevistado al agente Irizarry, quien había llegado primero a la escena. [8] Mencionó, además, que llenó el formulario PPR 606C, con el propósito de comenzar el trabajo de fotografía.[9] Expresó que tomó fotografías generales de la escena, como la carretera y la ubicación del mencionado vehículo, y recopiló piezas evidenciarias.[10] Añadió que también trabajó con el cuerpo del joven.[11] Igualmente, señaló que se entrevistó con el agente Rosario, investigador adscrito a la División de Homicidios del CIC.[12]

A preguntas del Ministerio Público, el agente Quiñones Camacho testificó que se recogieron unos casquillos de bala, se levantó pólvora con unos hisopos y se recopilaron unos fragmentos de bala.[13] Detalló que había fotografiado el cuerpo del occiso que se encontraba dentro del vehículo y, de igual forma, documentó las heridas que este último presentada en su cuerpo.[14]

Por otro lado, a preguntas de la defensa, el agente Quiñones Camacho contestó que no había preparado ningún croquis relacionado al lugar de los hechos.[15] Mencionó que quien preparó un croquis de la escena fue el agente Rosario.[16] Declaró que, cuando llegó a la escena quien tenía el control de esta era el agente Obed Irizarry del distrito de San Germán, mientras que, posteriormente, este le entregó el control de la misma al agente Rosario.[17] Aclaró, que había llegado primero que el agente Rosario, pero que nadie le entregó la escena.[18] Igualmente, señaló que, cuando llegó el agente Obed Irizarry, no había acordonado el área, pero había bloqueado el

---

[8] TPO, pág.10.
[9] Íd.
[10] Íd.
[11] Íd.
[12] Íd.
[13] Íd., pág. 11.
[14] Íd.
[15] Íd., pág. 17.
[16] Íd.
[17] Íd., pág. 31.
[18] Íd., pág. 32.

tránsito.[19] Según relató, Obed Irizarry no le había indicado que entre los edificios veintiuno (21) y veintidós (22) habían varios casquillos.[20] Aseguró que esto fue descubierto luego de que empezaron la búsqueda en la escena.

### Jean Mabel Vázquez Mendoza

El desfile de prueba continuó con el testimonio de Jean Mabel Vázquez Mendoza (Vázquez Mendoza). A preguntas del Ministerio Público, Vázquez Mendoza testificó que, desde el año 2016, era coordinadora de prevención de pérdidas del supermercado Mr. Especial.[21] Mediante su testimonio, se admitieron en evidencia unos *CD´s* con fragmentos de videos grabados el 29 de abril de 2019; de las cámaras trece (13) y catorce (14) del referido supermercado. Señaló que la cámara trece (13) del establecimiento enfocaba el portón del estacionamiento y hacia el residencial El Recreo.[22] Del mismo modo, expresó que la cámara catorce (14) enfocaba al estacionamiento, una esquina de la urbanización y a la carretera principal.[23]

Durante el contrainterrogatorio, Vázquez Mendoza admitió que no se familiarizó con las imágenes de los videos.[24] Especificó que las cámaras no abarcaban todo el frente del residencial El Rossy, ni del residencial El Recreo.[25] Asimismo, afirmó que fueron los agentes quienes eligieron los fragmentos que serían utilizados en el juicio.[26]

### Agente Obed Irizarry Seda

Obed Irizarry Seda (agente Irizarry Seda) señaló que era agente investigador de la Policía.[27] Testificó que, el 29 de abril de

---

[19] TPO, pág. 33.
[20] Íd., pág. 33.
[21] Íd., pág. 42.
[22] Íd., págs. 61-62.
[23] Íd., págs. 64-65.
[24] Íd., pág. 67.
[25] Íd.
[26] Íd., pág. 68.
[27] Íd., pág. 70.

2019, a eso de las 9:50 p.m., se encontraba en el área de retén junto al sargento Ocasio, y el retén de turno, el agente Rodríguez.[28] Añadió que, una vez allí, escuchó unas fuertes detonaciones.[29] Narró que salió al estacionamiento porque pensó que los disparos fueron frente al cuartel. Sin embargo, manifestó que no encontraron nada y, estando en el estacionamiento, el agente Rodríguez recibió una llamada telefónica mediante la cual le informaron que había un "tiroteo" en el residencial El Recreo.[30]

El agente Irizarry Seda narró que se dirigió al residencial El Recreo, ubicado cerca del cuartel,[31] y al llegar se topó con un tumulto de gente rodeando un vehículo.[32] Mencionó que se dirigió al vehículo, llamó al sargento y se percató que estaba la puerta abierta del vehículo.[33] Explicó que, dentro del vehículo había un caballero sentado al lado de la puerta del conductor y con una joven que tenía "acogida [a] su pecho".[34]

Asimismo, el agente Irizarry Seda aclaró que el vehículo era un Toyota modelo Corolla, color azul, con perforaciones que aparentaban ser impactos de balas.[35] Detalló que, cuando encontró la escena, comenzó a apartar a las personas del área.[36] Testificó, además, que mientras esparcía a las personas, observó casquillos de bala y proyectiles en el suelo, cerca del vehículo.[37] Igualmente, expresó que el padre de la joven que se encontraba en el asiento del pasajero del vehículo, se identificó y que esta tenía sangrado en el lado derecho de la cabeza; se veía algo aturdida, e intentaba hablarle a su padre.[38] Del mismo modo, señaló que el joven, que se

---

[28] TPO, pág. 70.
[29] Íd.
[30] Íd., págs. 70-71.
[31] Íd., pág. 71.
[32] Íd., pág. 72.
[33] Íd.
[34] Íd.
[35] Íd., págs. 72-73.
[36] Íd., pág. 72.
[37] Íd., pág. 74.
[38] Íd., págs. 72-73.

encontraba en el asiento del conductor, tenía una perforación en la cabeza y estaba bañado en sangre.[39]

En su relato, el agente Irizarry Seda explicó que, al determinar que tenían a una persona sin vida, el sargento llamó a una ambulancia. [40] Particularizó que, cuando llegó la ambulancia, recogieron a la joven que se encontraba viva y continuaron custodiando la escena.[41] Añadió que sacaron a todas las personas del lugar de los hechos y bloquearon la entrada principal con una patrulla. [42] Testificó, además, que mantuvieron todo controlado hasta que llegó la Unidad de Homicidios.[43] Señaló que el agente Rosario de la Unidad de Homicidios continuó con la investigación; que también llegó el agente Quiñones de Servicios Técnicos y; que él les entregó el caso a estos.[44]

Durante el contrainterrogario, el agente Irizarry Seda no pudo asegurar que hubiese un registro que estableciera que a las 9:49 p.m., recibieron una llamada en el cuartel.[45] Tampoco pudo precisar en qué momento el agente Rosario llegó a la escena o si había un policía municipal cuando llegó.[46] Igualmente, admitió que de sus datos no se desprendía cuándo entregó la escena ni que haya hablado con el agente Rosario. [47] Además, no pudo nombrar el método de investigación que se utilizó, ni pudo contestar la cantidad de casquillos que se encontraron en el lugar de los hechos.[48]

### Wesley Silva Angleró

El testigo Wesley Silva Angleró (Silva Angleró), declaró que, por casi treinta y seis (36) años, residía en el residencial El Recreo

---

[39] TPO, pág. 73.
[40] Íd., pág. 74.
[41] Íd., págs.74-75.
[42] Íd., pág. 75.
[43] Íd.
[44] Íd., págs. 75-80.
[45] Íd., págs. 89-91.
[46] Íd., págs. 95-96.
[47] Íd., pág. 101.
[48] Íd., págs. 103-104.

en San Germán.[49] Indicó ser el padre de Ashley Silva Flores (Ashley), quien tenía veintiséis (26) años de edad y residía con él.[50] Añadió que también vivía junto a su esposa y sus otros dos (2) hijos.[51] Igualmente, expresó que conocía a Andrés Lozada Zapata (Andrés) porque era el novio de su hija Ashley.[52]

Silva Angleró narró que, el 29 de abril de 2019, su hija Ashley y el novio de esta, Andrés, fueron atacados a tiros frente al "Residencial", a pocos pasos de su hogar.[53] Testificó que, ese día, Andrés recogió a Ashley para ir a comer a *Burger King*.[54] Añadió que, mientras esperaba en su casa para asearse, escuchó varias detonaciones, las cuales cesaron por unos segundos y luego continuaron.[55] Asimismo, mencionó que eran muchos tiros y describió a los primeros como entrecortados.[56] Expresó que luego fue el "caos", que eran demasiado fuertes los tiros y parecía que era frente a la casa.[57] Detalló que, al cesar los disparos, su esposa y sus dos hijos salieron al área del pasillo.[58] Aclaró que su hija, Ashley, se había ido de la casa entre las 9:35 y 9:40 p.m.[59] Señaló, además, que su esposa, luego de algunos intentos, logró comunicación vía telefónica con Ashley; por lo que comenzó a gritar y a llorar.[60] Expresó que Ashley le había solicitado que la ayudara.[61]

Silva Angleró declaró que, acto seguido, salió solo a buscar a su hija y al novio de esta, porque pensó que estaban asustados.[62] Narró que, cuando bajó la escalera de su casa y salió a la acera principal, vio unas luces encendidas y asumió que era el vehículo

---

[49] TPO, pág. 114.
[50] Íd., págs. 114-115.
[51] Íd.
[52] Íd.
[53] Íd., pág. 115.
[54] Íd., pág. 116.
[55] Íd.
[56] Íd.
[57] Íd., págs. 116-117.
[58] Íd., pág. 117.
[59] Íd., pág. 118.
[60] Íd., págs. 118-119.
[61] Íd.
[62] Íd., pág.119.

de Andrés.[63] Describió el vehículo de Andrés como uno de color azul oscuro.[64] Continuó narrando que, mientras se fue acercando al vehículo, se percató que estaba cubierto de agujeros de balas, desde al frente hacia atrás, por todo el lado del pasajero.[65] También, señaló que su esposa iba caminado detrás de él y le dijo que se detuviera, que llamara al 9-1-1.[66] Relató que abrió la puerta del vehículo y estaban los jóvenes ensangrentados.[67] Detalló que Andrés estaba encima de su hija, tratando de taparla con las dos (2) manos encima de su muslo; y que ella tenía la cabeza colgando hacia abajo, como si lo estuviera mirando.[68] Además, explicó que ella estaba en el asiento del pasajero y que todos los impactos de bala estaban de ese lado.[69] Igualmente, señaló que Andrés estaba en el asiento del conductor, recostado hacia el lado derecho, donde estaba Ashley.[70]

Según detalló Silva Angleró, logró abrir la puerta del pasajero y percibió que Ashley tenía un impacto de bala en la parte de atrás de la cabeza.[71] Narró que comenzó a buscarle pulso a su hija, pero no se lo encontraba, la abrazó y comenzó a orar; que de momento su hija le dijo que estaba bien, que no se iba a morir.[72] Mencionó que ella lo único que decía era, "Andrés, háblame, háblame, anda".[73] Describió que, al palparle en la cabeza a Ashley, encontró un "chichón", pudo sentir que era un agujero de bala, por lo que comenzó a hacerle presión con la mano y a hablarle.[74] Especificó que el "chichón" lo sintió arriba de la oreja, del lado derecho de la cabeza de Ashley.[75]

---

[63] TPO, pág. 119.
[64] Íd.
[65] Íd., pág. 121.
[66] Íd.
[67] Íd.
[68] Íd.
[69] Íd.
[70] Íd., pág. 122.
[71] Íd., págs. 122-123.
[72] Íd., pág. 123.
[73] Íd.
[74] Íd.
[75] Íd., pág. 124.

Durante su testimonio, Silva Angleró narró que, posteriormente, llegó un oficial de la Policía y una ambulancia; pusieron a Ashley en una camilla y se la llevaron al Hospital La Concepción.[76] Añadió que, antes de que se llevaran a su hija, la mantuvieron en la ambulancia unos minutos.[77] También relató que Andrés ya no tenía signos vitales, por lo que no pudieron hacer nada.[78] Relató que su hija recibió asistencia médica, la entubaron y luego fue transportada al Centro Médico en Río Piedras.[79] Mencionó, además, que un agente de la Policía le hizo varias preguntas antes de partir hacia Río Piedras.[80]

En cuanto a la atención médica de su hija, Silva Angleró testificó que le indujeron un coma.[81] Particularizó que un médico le había indicado que su hija estaba batallando por su vida; que había que extraerle una bala de la cabeza; que recibió un impacto de bala en la entrada y salida de su rodilla derecha; que tenía un fragmento de bala cerca de la frente y; que tenían que operarla de emergencia.[82] Añadió que también le informaron que, luego de la operación, su hija estaría afectada permanentemente.[83]

Según el testigo Silva Angleró, Ashley tenía todo el lado izquierdo paralizado, no podía mover su pierna, no podía abrir su ojo izquierdo y tampoco podía verbalizar correctamente.[84] Abundó que esta recibió tratamiento para rehabilitación en el Centro de Rehabilitación de Carolina y su estado mejoró.[85]

A preguntas de la defensa, Silva Angleró declaró que, el Policía que se personó al lugar de los hechos cuando él estaba atendiendo a su hija, era uno municipal; que la Policía estatal nunca llegó para

---

[76] TPO, pág. 124.
[77] Íd., pág. 125.
[78] Íd.
[79] Íd.
[80] Íd.
[81] Íd., pág. 126.
[82] Íd.
[83] Íd., pág. 127.
[84] Íd., pág. 129.
[85] Íd.

hacerle preguntas del caso.[86] Aclaró que la Policía estuvo en la escena siete (7) o diez (10) minutos.[87] Asimismo, añadió que fue después de que su hija fue montada en la ambulancia que llegó la Policía, pero que eso no surgía de la declaración jurada que prestó.[88] Igualmente, señaló que, antes de salir de la escena, no tuvo contacto con ningún otro Policía.[89]

Por otro lado, Silva Angleró admitió que no observó si en el área había casquillos "o algo".[90] De igual forma, a preguntas de la defensa, el testigo admitió que le dijo a la Policía que no tenía conocimiento de los hechos, que solo salió y se encontró con la escena.[91] No obstante, durante el turno de redirecto del Ministerio Público, aclaró que cuando llegó la Policía al lugar de los hechos, siempre estuvo concentrado en su hija para ayudarla.[92]

### Andrés González Ortiz

Por su parte, Andrés González Ortiz (González Ortiz) testificó que, para la fecha de los hechos, llevaba cuatro (4) años viviendo junto a su esposa en el residencial El Rossy, ubicado en el pueblo de San Germán.[93] Narró que, para dicha fecha, trabajaba en la venta de drogas en los residenciales El Rossy y El Recreo.[94] Declaró que los mencionados residenciales eran en el mismo lugar, ya que lo único que lo dividía era es un "portoncito" que se le conocía como "la frontera".[95]

González Ortiz continuó relatando que conocía a Rosario Martínez desde hacía dos (2) a tres (3) meses porque este bajaba de Mayagüez a San Germán con drogas y armas.[96] El testigo identificó

---

[86] TPO, pág. 141.
[87] Íd.
[88] Íd., págs. 143-144.
[89] Íd., pág. 144.
[90] Íd., pág. 146.
[91] Íd., págs. 147-148.
[92] Íd., pág. 153.
[93] Íd., pág. 159.
[94] Íd.
[95] Íd., pág. 160.
[96] Íd.

a Rosario Martínez en corte abierta.[97] Asimismo, narró que, el 29 de abril de 2019, en horas de la noche, se encontraba en la frontera junto a Jeffrey, Rosario Martínez, William y Christian.[98] Señaló que había crecido con William y que Christian era su cuñado.[99] Añadió que, cerca de la frontera, estaban Tito y Cristal.[100] Mencionó que Rosario Martínez estaba con un arma puesta en el lado derecho de la cintura.[101] Describió el arma como una "cuarenta (40)", con peine *clear* de tambor redondo, lleno de muchas balas.[102] Especificó que dicha arma la había visto el día anterior a los hechos.[103]

Según narró González Ortiz, a eso de las 9:50 p.m. del mismo día, Ramoncito llamó a Jeffrey para indicarle que había un carro detrás de su casa.[104] Añadió que Ramoncito era uno de los que trabajaba en El Recreo, y que Jeffrey recibió la información de Ramoncito de que había un vehículo detrás del residencial El Recreo.[105] Declaró, además, que, cuando recibieron la información, buscó a Tito, quien estaba hablando con Cristal en las escaleras. Especificó que Rosario Martínez, Jeffrey, William, Tito, Christian y él, bajaron hacia donde se encontraba el vehículo estacionado.[106] Relató que, cuando llegaron al área donde estaba el automóvil, se dividieron; Jeffrey, William, Christian y Tito se fueron por al frente del edificio, y Rosario Martínez y él, por la parte de atrás.[107]

González Ortiz detalló que, cuando llegaron al área, Ramoncito les indicó que liquidaran al carro y Rosario Martínez sacó el arma y comenzó a dispararle al vehículo.[108] También mencionó que esto ocurrió en el edificio veintidós (22) del residencial El

---

[97] TPO, pág. 160.
[98] Íd., pág. 161.
[99] Íd.
[100] Íd.
[101] Íd., pág. 162.
[102] Íd.
[103] Íd., pág. 163.
[104] Íd., pág. 164.
[105] Íd.
[106] Íd.
[107] Íd., págs. 164-165.
[108] Íd., pág. 166.

Recreo.[109] Además, describió al vehículo como de color oscuro y señaló que estaba estacionado hacia el área del coliseo ubicado en el residencial El Recreo.[110] Que entre el vehículo y ellos se encontraba la verja del residencial El Recreo.[111]

El testigo González Ortiz relató que Rosario Martínez comenzó a disparar con un arma color negra y que las detonaciones fueron corridas.[112] Mencionó que, entre Rosario Martínez y él, había unos treinta y ocho (38) pies de distancia, y que se encontraba en la parte posterior de Rosario Martínez.[113] Aclaró que las detonaciones iban dirigidas al vehículo oscuro que se encontraba estacionado afuera del residencial El Recreo y estas fueron realizadas desde las armas de Rosario Martínez y Jeffrey.[114] Añadió que, una vez cesaron las detonaciones, se fueron corriendo. Aclaró que Rosario Martínez, Jeffrey, William, Christian, Tito y él, se fueron hacia la frontera, mientras que este se fue para su hogar.[115]

González Ortiz también señaló que, en mayo de 2019, lo arrestaron y fue llevado a la comandancia de Mayagüez, en donde le indicaron que sería procesado, por lo que decidió hablar.[116] Mencionó que le leyeron sus derechos y que llenó un documento frente al agente Rosario.[117] Relató, además, que el 29 de mayo de 2019 le tomaron una declaración jurada, pero se sentía nervioso porque su esposa todavía vivía en el residencial.[118] De otro lado, a preguntas del fiscal, contestó que bajó hacia el carro para verificarlo porque en días anteriores habían tiroteado el residencial El Recreo.[119]

---

[109] TPO, pág. 166.
[110] Íd.
[111] Íd.
[112] Íd., pág. 167.
[113] Íd., págs. 167-168.
[114] Íd., pág. 169.
[115] Íd., págs. 169-171.
[116] Íd., pág. 176.
[117] Íd., págs. 176-177.
[118] Íd., págs. 177-178.
[119] Íd., pág. 179.

Por otro lado, González Ortiz aclaró que, cuando bajaron hacia el vehículo, Ramoncito le dijo a Rosario Martínez que verificara el carro y este sacó el arma calibre "cuarenta (40)" con peine *clear* de tambor y comenzó a dispararle al vehículo color oscuro.[120] Enfatizó que, con relación al vehículo, tenía una visibilidad clara.[121] Describió que, una vez Rosario Martínez disparó, se fue corriendo con el arma.[122]

Durante el contrainterrogatorio, González Ortiz admitió que en su declaración jurada no había señalado que Rosario Martínez llevara armas de fuego al residencial El Recreo.[123] Admitió que en su declaración jurada había indicado que conocía a Rosario Martínez desde hacía dos (2) meses.[124] Igualmente, señaló que del referido documento no se desprendía que se comunicaba con Rosario Martínez y que este llegaba al residencial El Recreo a las 7:00 a.m. todos los días.[125] Aclaró que la declaración jurada la prestó un (1) mes luego de ocurridos los hechos.[126] De otro lado, admitió que lo arrestaron como sospechoso de haber matado a la víctima.[127]

González Ortiz continuó testificando, durante el turno de la defensa, que el 8 de mayo de 2019, lo habían ingresado a una celda y le indicaron que era sospechoso de los hechos ocurridos el 29 de abril de 2019.[128] Añadió que, el 29 de mayo de 2019, lo citaron al cuartel nuevamente y decidió hablar.[129] Enfatizó que en dicha citación habló con la Policía de forma voluntaria.[130] No obstante, señaló que no se sentía seguro con la Policía.[131] Por otro lado,

---

[120] TPO, págs. 187-188.
[121] Íd. pág. 190.
[122] Íd. págs. 194-195.
[123] Íd. págs. 198-199.
[124] Íd. pág. 198.
[125] Íd. pág. 199.
[126] Íd.
[127] Íd.
[128] Íd., pág. 200.
[129] Íd.
[130] Íd., págs. 201-202.
[131] Íd., pág. 202.

admitió que, en su confesión, no dijo que Rosario Martínez disparó, ni mencionó que Rosario Martínez estuviera armado.[132] Además, admitió que, en su declaración jurada, no decía que Rosario Martínez y él compartían diariamente.[133]

González Ortiz continuó contestando las preguntas de la defensa y negó haber buscado un arma de fuego antes de entrar a la frontera de los residenciales El Recreo y Manuel F. Rossy.[134] Contestó que, a requerimiento de Ramoncito para verificar el vehículo en cuestión, "él bajó normal" hacia donde se encontraba el vehículo.[135] También admitió que sabía que Rosario Martínez tenía dieciséis (16) años, que nunca lo vio conduciendo un automóvil y que siempre lo llevaban otras personas al estacionamiento del residencial El Recreo.[136] Declaró que bajó a la frontera de los residenciales a las 2:00 p.m., que estuvo con Rosario Martínez y que, desde esa hora hasta las 9:30 p.m., Rosario Martínez estuvo allí fumando.[137] Afirmó que lo anterior no lo incluyó en su declaración jurada.[138] De igual modo, admitió que no había declarado que Rosario Martínez tuviera problemas con alguien, ni que haya sido objeto de algún atentado.[139] De otro lado, declaró que había concluido, luego de los hechos ocurridos el 29 de abril de 2019, que había un arma de fuego, pero que no la vio y que tampoco declaró que vio alguna marca que dijera que el calibre de esa arma era punto cuarenta (.40).[140]

### Cristal Cruz Marrero

Cristal Cruz Marrero (Cruz Marrero) testificó que, para el 29 de abril de 2019, residía en el residencial Manuel F. Rossy, junto a

---

[132] TPO, págs. 202-203.
[133] Íd., pág. 207.
[134] Íd., pág. 209.
[135] Íd., pág. 210.
[136] Íd., pág. 212.
[137] Íd., pág. 213.
[138] Íd.
[139] Íd., pág. 214.
[140] Íd., pág. 218.

sus hijos y Ángel Torres Negrón, a quien le decían Tito.[141] Aclaró que el Rossy quedaba en San Germán, en el redondel, con relación a El Recreo.[142] Asimismo, declaró que, el 29 de abril de 2019, a eso de las 9:00 p.m., estaba sentada en las escaleras cerca de su apartamento en el residencial Manuel F. Rossy.[143] Añadió que, frente a su apartamento estaba el redondel, donde se pasaban "los muchachos".[144]

Cruz Marrero narró que, ese día, observó un "nebuleo" entre Jeffrey, Ramón, Andrés y Rosario Martínez, a quien llamó "el odioso", y le dijo a Ángel que se quedara sentado con ella en las escaleras.[145] Esta identificó a Rosario Martínez en corte abierta,[146] y señaló que lo conocía desde hacía dos (2) días antes de los hechos.[147] Igualmente, declaró que Andrés se acercó a Ángel, quien estaba al lado de Cruz Marrero sentado en las escaleras del residencial Manuel F. Rossy y le dijo a Ángel que los acompañara a verificar un vehículo estacionado en el residencial El Recreo.[148] Detalló que ella le había dicho a Ángel que no fuera a revisar el vehículo porque había visto un "nebuleo", pero que este le indicó que estuviera tranquila, que no iba a suceder nada.[149] Además, relató que se fueron Jeffrey, Ramón, Andrés, Rosario Martínez y Ángel en dirección al residencial El Recreo y ella entró a su apartamento; luego escuchó varias detonaciones.[150] Señaló que unos tiros eran pausados y otros corridos.[151]

Según testificó Cruz Marrero, se asomó en el balcón de su apartamento y observó unos biombos azules; vio a Andrés, a Tito, a

---

[141] TPO, págs. 247-248.
[142] Íd., pág. 248.
[143] Íd.
[144] Íd.
[145] Íd., págs. 249-250.
[146] Íd. pág. 250.
[147] Íd.
[148] Íd. págs. 251-252.
[149] Íd. págs. 252-253.
[150] Íd., págs. 252-253.
[151] Íd.

Christian, a Jeffrey, a Ramón y a Rosario Martínez corriendo hacia su hogar.[152] Mencionó que observó que Rosario Martínez y Jeffrey llevaban cada uno un arma de fuego en la cintura pero que no vio a nadie más con armas.[153] Describió que el arma de Rosario Martínez poseía algo que sobresalía hacia afuera en forma circular.[154]

Por otro lado, Cruz Marrero narró que Ángel regresó asustado al apartamento y le dijo que no hizo nada.[155] Indicó que, el 7 de mayo de 2019, agentes de la División de Homicidios de la Policía llegaron a su apartamento y le dejaron una citación dirigida a Ángel.[156] Señaló que acudió a la comandancia con Ángel, junto a la madre de este, y allí lo orientaron sobre lo que estaba ocurriendo.[157] Explicó que a Ángel le informaron que era sospechoso de la "matanza" de Andrés Lozada Zapata y el agente Rosario habló con él.[158] Testificó que a ella también la orientaron sobre lo que estaba sucediendo con Ángel.[159] Añadió que también le mencionaron que Jeffrey, Rosario Martínez y Ernesto eran sospechosos del asesinato de Andrés Lozada Zapata.[160] De igual modo, declaró que Ángel le había indicado que Jeffrey y "el odioso" le dispararon al vehículo extraño que vieron en el residencial El Recreo.[161] Sobre esto, añadió que le preguntó a Ángel si había hecho algo y este le juró que no.[162] De otro lado, mencionó que le mostraron unas fotografías de Rosario Martínez en la comandancia para verificar si lo reconocía y así lo hizo.[163] Aclaró que, cuando lo reconoció, circuló el número de la foto

---

[152] TPO, pág. 253.
[153] Íd., págs. 253-254.
[154] Íd., pág. 254.
[155] Íd., pág. 255.
[156] Íd.
[157] Íd., pág. 256.
[158] Íd.
[159] Íd., pág. 257.
[160] Íd.
[161] Íd., pág. 261.
[162] Íd.
[163] Íd., pág. 269.

y puso sus iniciales en esta y tardó cinco (5) minutos en identificarlo.[164]

Durante el contrainterrogatorio, Cruz Marrero admitió que tenía temor de que le quitaran a sus hijos e ingresaran a Ángel a una institución penal.[165] También reconoció que, en la declaración jurada de Ángel, indicaba que escuchó un disparo en el área donde se encontraba Rosario Martínez, pero que en la declaración jurada de ella decía que Ángel le comentó que Rosario Martínez fue quien disparó.[166] Señaló que no recuerda cómo vestía Rosario Martínez el día de los hechos.[167] Igualmente, reconoció que en su declaración jurada no había mencionado que vio algo redondo en la cintura de Rosario Martínez y tampoco recordaba de qué color era el arma de fuego.[168]

Cruz Marrero admitió que desconocía hacia dónde corrió Rosario Martínez luego de los hechos.[169] Aceptó que, cuando estaba en la comandancia, no dio descripciones de Rosario Martínez.[170] Añadió, además, que el 14 de junio de 2019 fue a un *lineup* de fotografías, las cuales observó por cinco (5) minutos.[171] Aclaró que el agente no le dijo que "alguien allí era el que era".[172] También mencionó que a Ángel no le radicaron cargos.[173]

### Ángel Torres Negrón

Ángel Torres Negrón (Torres Negrón) señaló durante su interrogatorio que lo conocían como "Tito".[174] También mencionó que no sabía leer ni escribir.[175] Relató que, el 29 de abril de 2019, vivía en San Germán, en el residencial El Recreo, junto a su hija y

---

[164] TPO, págs. 269-271.
[165] Íd., pág. 286.
[166] Íd., págs. 288-289.
[167] Íd., pág. 292.
[168] Íd., págs. 289-299.
[169] Íd., pág. 304.
[170] Íd., pág. 309.
[171] Íd.
[172] Íd., pág. 310.
[173] Íd., pág. 312.
[174] Íd., pág. 342.
[175] Íd.

su esposa Cristal.[176] Testificó que, para la fecha de los hechos, se encontraba en el balcón de su apartamento junto con su esposa.[177] Narró que, mientras se encontraba allí, Andrés le dijo que lo acompañara para "cheaquear" un vehículo.[178] Enfatizó que su esposa le dijo que no se fuera, porque le iba a pasar algo.[179] Detalló que bajó con Jeffrey, Rosario Martínez, Andrés y Christian para verificar el referido automóvil que se encontraba en la esquina del residencial El Recreo.[180] Añadió que, cuando bajaron, Andrés y Rosario Martínez se fueron por un lado y por el otro se fueron Jeffrey, Christian y él.[181] Testificó que Jeffrey y los que estaban con Andrés, abrieron fuego contra el vehículo.[182] Señaló que Jeffrey "tiró" con un arma color negra.[183] Además, mencionó que Rosario Martínez también tiró porque era quien tenía una pistola encima con peine de caracol.[184] Describió que los disparos provenientes del área donde se encontraba Rosario Martínez fueron corridos, mientras que los del lado de Jeffrey fueron lentos.[185] Asimismo, relató que, luego de que abrieron fuego, subieron corriendo hacia la frontera y él cogió para su apartamento.[186]

El testigo Torres Negrón también narró que, antes de salir corriendo, se asomó al interior del vehículo y vio a un hombre y a una mujer tirados de lado en el área del conductor y pasajero.[187] Detalló que el automóvil estaba lleno de boquetes que fueron ocasionados por las balas.[188] Señaló que todos corrieron para sus

---

[176] TPO, págs. 342-343.
[177] Íd., pág. 345.
[178] Íd., pág. 346.
[179] Íd., pág. 347.
[180] Íd., págs. 347-349.
[181] Íd., pág. 349.
[182] Íd.
[183] Íd.
[184] Íd., págs. 351-352.
[185] Íd., pág. 353.
[186] Íd.
[187] Íd.
[188] Íd., pág. 354.

respectivos apartamentos.[189] Añadió que Rosario Martínez y Jeffrey corrieron con sus armas de fuego en la cintura.[190]

Por otro lado, Torres Negrón testificó que el agente Rosario fue a buscarlo a su apartamento y lo entrevistó en la comandancia de Mayagüez.[191] Según indicó, le dijo al agente Rosario que estaba en su apartamento con su esposa y que Andrés lo buscó; que bajaron y Rosario Martínez y Jeffrey "abrieron" fuego contra esas personas.[192] Mencionó que, mientras hablaba con el agente Rosario, Cristal estaba al lado suyo hablando y el compañero del agente Rosario anotaba, ya que él no sabía leer ni escribir.[193] Igualmente, aclaró que había visto a Rosario Martínez dos (2) veces en el pasillo de su apartamento y que este vivía con Jeffrey en el apartamento de al lado.[194] El testigo identificó a Rosario Martínez en corte abierta.[195]

A preguntas del Ministerio Público, Torres Negrón admitió que no pudo identificar a nadie en "papel".[196] También afirmó que, el día que fue citado, figuraba como sospechoso de asesinato.[197] Detalló que, cuando Andrés bajó, este no tenía arma de fuego y que vio a Rosario Martínez disparar.[198] Por otro lado, a preguntas de la defensa, admitió que estaba vigilando cuando se emitieron las detonaciones, pero que desconocía si le radicaron cargos por ello.[199]

**Agente Nelson González Quiñones**

El agente Nelson González Quiñones (agente González Quiñones) indicó que era un agente de la Policía adscrito a la División de Homicidios.[200] Relató que, el día de los hechos su supervisor le asignó, junto a su compañero Julio Rosario, una

---

[189] TPO, pág. 355.
[190] Íd.
[191] Íd., pág. 357.
[192] Íd., pág. 359.
[193] Íd., págs. 359-360.
[194] Íd., pág. 360.
[195] Íd., pág. 365.
[196] Íd., pág. 368.
[197] Íd., pág. 370.
[198] Íd., págs. 376-383.
[199] Íd., pág. 384
[200] Íd., pág. 396.

investigación de un caso relacionado a la muerte de una persona en el pueblo de San Germán.[201] Aclaró que eso fue como a las 10:30 p.m.[202] Continuó narrando que se personaron al residencial El Recreo y se encontraron con el área custodiada por la Policía municipal, así como con personal de manejo de emergencias.[203] Pormenorizó que en la escena pudo observar un Toyota, marca Corolla, color azul oscuro.[204] Testificó, además, que comenzaron a hacer entrevistas, investigar y a confeccionar un croquis rústico.[205] Dicho croquis fue admitido en evidencia sin objeción de la defensa.[206]

Continuó relatando el agente González Quiñones que en el vehículo había un joven en el área del conductor, el cual presentaba heridas de bala y estaba recostado hacia el área del asiento del pasajero.[207] Aclaró que la persona había fallecido a causa de impactos de bala.[208] Igualmente, detalló que el automóvil presentaba perforaciones e impactos de proyectiles de balas disparadas.[209] Añadió que, antes de hacer el croquis, procedieron a hacer una búsqueda lineal en la escena para identificar evidencia.[210] Apuntó que, encontraron proyectiles de bala, casquillos y blindajes derivados.[211] Especificó que los casquillos eran calibre punto cuarenta (.40) y nueve (9) milímetros.[212] Por su parte, la defensa no le realizó preguntas al testigo por entender que era prueba acumulativa.[213]

---

[201] TPO, págs. 396-397.
[202] Íd., pág. 397.
[203] Íd.
[204] Íd.
[205] Íd.
[206] Íd., págs. 402-403.
[207] Íd., pág. 398.
[208] Íd.
[209] Íd.
[210] Íd., pág. 399.
[211] Íd.
[212] Íd., pág. 401.
[213] Íd., pág. 414.

### Emilio Oscar Lozada Nazario

En lo pertinente, Emilio Oscar Lozada Nazario declaró que era el padre de Andrés Lozada Zapata y que su hijo no tenía problemas con persona alguna.[214] La defensa no le realizó preguntas.[215]

### Agente Luis A. Seguí Serrano

El agente Luis A. Seguí Serrano (agente Seguí Serrano) declaró que pertenecía a la División de Servicios Técnicos del CIC de Mayagüez.[216] Mencionó que, el 29 de abril de 2019, el agente Rosario le solicitó realizar un *lineup* de fotografías porque no tenían disponible a la persona acusada para realizar una rueda de detenidos.[217] Señaló que el agente Rosario se sentó a su lado y escogió a los candidatos con características similares a la persona sospechosa.[218] Añadió que una vez grabado el *lineup* de fotografías, procedió a entregárselo al agente Rosario Barreto.[219] Se marcaron como Exhibit #23 y #24 del Ministerio Público los documentos que preparó del *lineup* de fotografías.[220] No hubo objeción de la defensa en cuanto a dichos exhibits. A preguntas de la defensa, el agente Seguí Serrano contestó que no estuvo en el *lineup* de fotografías y reiteró que los candidatos los eligió su compañero.[221]

### Ashley Michelle Silva Flores

La testigo Ashley Michelle Silva Flores (Silva Flores) declaró que residía en el residencial El Recreo con su padre, su madre y sus tres hermanos.[222] Expresó que era novia de Andrés Lozada Zapata (Lozada Zapata), a quien conocía hace un (1) año y nueve (9) meses.[223] Relató que, el 29 de abril de 2019, estuvieron texteando

---

[214] TPO, págs. 414-419.
[215] Íd., pág. 419.
[216] Íd., pág. 420.
[217] Íd., pág. 421.
[218] Íd., pág. 422.
[219] Íd.
[220] Íd., págs. 422-423.
[221] Íd., pág. 429.
[222] Íd., pág. 437.
[223] Íd., págs. 437-438.

porque él se iba a quedar en su apartamento.[224] Detalló que Lozada Zapata tenía un vehículo Toyota, marca Corolla, color azul oscuro.[225]

Silva Flores continuó relatando que Lozada Zapata y ella fueron víctimas de una balacera.[226] Detalló que, en horas de la noche, ella se encontraba en su apartamento esperando por Lozada Zapata, ya que se iba a quedar en su apartamento.[227] Mencionó que Lozada Zapata llegó a su apartamento ese día y fueron a comer a *Burger King* en el carro de Lozada Zapata.[228] Detalló que, luego de ordenar la comida, regresaron al residencial El Recreo y le dijo a Lozada Zapata que se estacionara "más atrás", en el estacionamiento más cercano al apartamento.[229] Narró que ella estaba en el asiento del pasajero y Lozada Zapata en el asiento del conductor; que conversaban y comían.[230] Señaló que, posteriormente, sintió su cuerpo extraño y pesado; que no se podía mover y no sabía lo que le había sucedido.[231] Continuó describiendo que: Lozada Zapata la estaba llamando; que ella no podía reaccionar a lo que él le estaba diciendo; que recordaba haber visto unos destellos color anaranjados; que lo último que le dijo Lozada Zapata fue "[a]y baby", y no escuchó nada más; que sentía un olor como a metal en el vehículo; que se quedó inconsciente y; que pudo reaccionar de momento y vio el cuerpo de Lozada Zapata en su falda, quien no le contestaba.[232]

Asimismo, Silva Flores testificó que buscó su teléfono y se percató que su mamá la estaba llamando.[233] Mencionó que le

---

[224] TPO, págs. 438-439.
[225] Íd.
[226] Íd., pág. 439.
[227] Íd.
[228] Íd., pág. 440.
[229] Íd., pág. 441.
[230] Íd., pág. 442.
[231] Íd.
[232] Íd.
[233] Íd., pág. 443.

solicitó ayuda a su madre.[234] Además añadió que su padre llegó al lugar de los hechos y que lo escuchó hablando.[235] Igualmente, apuntó que recibió atención médica y que despertó en el Centro Médico de Río Piedras, en el área de intensivo.[236] Detalló que tenía tres (3) impactos de bala; específicamente dos (2) en la cabeza, uno (1) penetró completamente en ella, y otro en la rodilla derecha.[237] Testificó que, a consecuencias de los disparos, quedó hemipléjica.[238] Por otro lado, a preguntas de la defensa, contestó que, el día de los sucesos, no pudo ver a ningún grupo ni a ninguna persona alrededor del vehículo.[239]

### Christian Rivera Torres

Por su parte, el testigo Christian Rivera Torres (Rivera Torres), declaró que, para el 29 de abril de 2019, vivía en el residencial el Rossy.[240] Igualmente, mencionó que conocía a Jeffrey y a Rosario Martínez, este último desde hacía una semana, porque iba al residencial con Jeffrey todos los días.[241] También expresó que Rosario Martínez y él comenzaron a vender marihuana juntos.[242] El testigo identificó a Rosario Martínez en corte abierta.[243]

Rivera Torres prosiguió declarando que, el 29 de abril de 2019, en horas de la noche, se encontraba en "la frontera", lugar que divide a los residenciales el Rossy y El Recreo.[244] Señaló que estaba con Jeffrey, Tito, William y Andrés.[245] Detalló que, Rosario Martínez tenía un arma de fuego, color negra, con un caracol, redondo, en el lado derecho de la cintura.[246] Igualmente, mencionó que Cristal, la

---

[234] TPO, pág. 443.
[235] Íd., pág. 443-444.
[236] Íd., pág. 444-445.
[237] Íd., pág. 445-446.
[238] Íd., pág. 446.
[239] Íd., pág. 450.
[240] Íd., pág. 459.
[241] Íd., pág. 461.
[242] Íd., pág. 462.
[243] Íd.
[244] Íd.
[245] Íd., pág. 463.
[246] Íd.

esposa de Ángel, se encontraba en las escaleras del edificio donde ella vivía.[247] Declaró, además, que Jeffrey recibió una comunicación de Ramoncito por medio de *walkie talkie*.[248] Añadió que Rosario Martínez, Jeffrey, Andrés, William y él bajaron para el frente del residencial porque había un vehículo.[249] Aclaró que bajó por curiosidad.[250] Puntualizó que, el día antes, habían "tirado tiros" al residencial.[251] Declaró que, cuando bajaron, Jeffrey y Rosario Martínez estaban armados en la cintura.[252] Igualmente, mencionó que Rosario Martínez y Jeffrey estaban disparando al vehículo en cuestión; Rosario Martínez con el arma de fuego, color negra, con peine de caracol.[253] Describió que los disparos fueron corridos, los cuales ocasionaron la muerte "a un muchacho y a una muchacha".[254] De igual modo, explicó que el muchacho que estaba guiando se tiró encima de la muchacha que estaba de pasajera, cubriéndola.[255] Continuó narrando que, cuando dejaron de disparar, subieron y, Rosario Martínez y Jeffrey, tenían las pistolas en mano.[256] Puntualizó que, Rosario Martínez subió al vehículo marca Nissan, color oro, cuatro puertas, y no lo vio más.[257]

Rivera Torres narró que, posteriormente, el 2 de mayo de 2019, lo cogieron con posesión de marihuana.[258] Añadió que el agente Rosario estaba haciendo la investigación y le dijo que necesitaba hablar con él porque había visto lo que ocurrió.[259] Asimismo, testificó que el agente Rosario lo entrevistó, lo trató bien y, por ello, decidió hablar sobre lo ocurrido.[260] Especificó que le había indicado

---

[247] TPO, pág. 465.
[248] Íd.
[249] Íd., pág. 466.
[250] Íd.
[251] Íd.
[252] Íd.
[253] Íd., págs. 465-469.
[254] Íd., págs. 469-470.
[255] Íd., pág. 470.
[256] Íd., págs. 471-472.
[257] Íd., pág. 472.
[258] Íd., pág. 482.
[259] Íd., pág. 483.
[260] Íd.

al agente Rosario que quería hablar porque lo que pasó con "esa gente" fue un abuso, pues estos no estaban involucrados "con la calle".[261] Particularizó, haciendo referencia a Jeffrey y Rosario Martínez, que dispararon sin preguntar nada, que si él llegaba a saber eso, no bajaba para donde estaba el vehículo de Lozada Zapata.[262]

A preguntas de la defensa, Rivera Torres declaró que se entrevistó en tres (3) ocasiones con el agente.[263] Relató que prestó confesión en la tercera ocasión.[264] Igualmente, durante el contrainterrogatorio, aclaró que el agente Rosario lo entrevistó el 2 de mayo de 2019, cuando lo arrestaron.[265] Añadió que, para esa fecha, ya se encontraba confinado, debido a que había sido arrestado por infracción a la Ley de Sustancias Controladas.[266] Admitió que el cargo que le radicaron no tenía el beneficio de probatoria.[267] De igual modo, mencionó que, el 9 de mayo de 2019, lo excarcelaron y prestó una declaración jurada a las 7:00 p.m.[268] Mencionó que, Rosario Martínez estuvo durante ocho (8) horas en el residencial El Recreo con el tambor fuera, a simple vista.[269] Aclaró que la primera vez que vio a Rosario Martínez fue una semana antes de los hechos ocurridos el 29 de abril de 2019.[270] También mencionó que él bajó, pero no lo hizo para "chequear" a nadie.[271]

**Agente Julio Rosario Barreto**

El agente Julio Rosario Barreto (agente Rosario Barreto) declaró que era un agente de la Policía adscrito a la División de Homicidios del CIC de Mayagüez.[272] Mencionó que, el día de los

---

[261] TPO, pág. 483.
[262] Íd.
[263] Íd., pág. 489.
[264] Íd.
[265] Íd., pág. 490.
[266] Íd., pág. 492.
[267] Íd.
[268] Íd., págs. 498-499.
[269] Íd., pág. 507.
[270] Íd., pág. 513.
[271] Íd., pág. 543.
[272] Íd., pág. 566.

hechos, recibió una llamada de su supervisor para que se reportara a trabajar debido a un asesinato que ocurrió en el distrito de San Germán. Detalló que fue el agente investigador designado al caso y que se personó al residencial El Recreo junto con el agente Nelson González Quiñones.[273] Relató que se encontraron con el área custodiada por la Policía municipal y estatal, así como con personal de manejo de emergencias.[274]

En particular, el agente Rosario Barrero testificó que, al llegar a la escena, se entrevistó con el agente Obed Irizarry, quien se encontraba custodiando la escena.[275] Declaró que dicho agente le informó que, al llegar al lugar de los hechos, observó un vehículo marca Toyota, modelo Corolla, color azul con múltiples impactos de bala y que, dentro del automóvil se encontraba el cuerpo sin vida de un joven y que la joven que iba de pasajera fue transportada al hospital porque estaba herida de bala.[276] Expresó que le ordenó al agente González Quiñones a confeccionar un croquis rústico.[277] Aclaró que dividió el personal para realizar una búsqueda lineal para identificar las piezas de evidencia.[278] Añadió que, además, pudo observar el cuerpo del occiso inclinado hacia el lado del pasajero del vehículo en cuestión.[279]

El agente Rosario Barreto admitió que dio las instrucciones para documentar y fotografiar la escena.[280] El Ministerio Público procedió a mostrar las fotografías del vehículo en cuestión al agente Rosario Barreto, las cuales fueron admitidas como exhibits.[281] Sobre ese particular, el agente Rosario Barrero declaró que el vehículo marca Toyota, color azul, tenía múltiples impactos de balas y en su

---

[273] TPO, pág. 566
[274] Íd., pág. 567.
[275] Íd.
[276] Íd., pág. 568.
[277] Íd.
[278] Íd., pág. 569.
[279] Íd., pág. 570.
[280] Íd.
[281] Íd.

interior se encontraba el joven occiso inclinado hacia el lado del pasajero. [282] Testificó que, en la búsqueda lineal de piezas de evidencia, pudieron identificar casquillos que se encontraban por el área de la puerta del asiento del pasajero, mientras que los impactos que presentaba el automóvil mayormente eran en la puerta del pasajero. [283] Declaró que los casquillos punto cuarenta (.40) milímetros se encontraban en un ángulo inclinado hacia la puerta del pasajero. [284] Añadió que, frente al vehículo, hacia el lado del pasajero, se ocuparon nueve (9) casquillos de bala punto nueve (.9) milímetros. [285] Indicó que levantó los casquillos, las balas y los blindajes de bala que se ocuparon en la escena. [286]

Asimismo, el agente Rosario Barreto continuó relatando que en el bosquejo preliminar de la escena del crimen aparecían los nombres que recibió de las personas sospechosas: Ramoncito, Jeffrey, Rosario Martínez, Chris, Tito, Andrés y William. [287] Expresó que, el día 9 de mayo de 2019, excarceló a Christian Torres, en compañía de Nelson González, y lo llevaron a la División de Homicidios de la Comandancia de Ponce para hablar sobre el asesinato. [288] Narró que Christian le había expresado que Rosario Martínez era la persona que suplía las sustancias controladas en los residenciales El Recreo y Manuel F. Rossy, que era uno de los más buscados y que estaba acusado en ese momento. [289] Relató que Christian le mencionó que Rosario Martínez y Jeffrey llevaban armas de fuego. [290] Describió que Christian hizo constar que vio a Rosario Martínez y a Jeffrey disparar, y que pudo observar al conductor

---

[282] TPO, págs. 570-571.
[283] Íd., págs. 573-574.
[284] Íd., pág. 574.
[285] Íd., pág. 576.
[286] Íd., pág. 582.
[287] Íd., pág. 591.
[288] Íd., pág. 595.
[289] Íd., pág. 596.
[290] Íd., pág. 597.

lanzarse hacia la joven que se encontraba en el asiento del pasajero.[291]

El agente Rosario Barrero prosiguió declarando que Ángel Torres Negrón, conocido como "Tito", proveyó una declaración jurada, escrita por su pareja Cristal.[292] Testificó que, en esa declaración jurada, Ángel Torres expresó que estaba vigilando cuando vio a Jeffrey disparar.[293] Continuó relatando que, el 29 de mayo de 2019, arrestó a Andrés y que este quiso hablar con él.[294] Expresó que, en la declaración, Andrés indicó que en el área estaba Rosario Martínez y que escuchó unas detonaciones dirigidas hacia un vehículo oscuro.[295] Según declaró, arrestó a Rosario Martínez y lo transportó a la Comandancia, donde compareció la madre de este y se le leyeron las advertencias de ley, tanto como menor y como adulto.[296] Narró que se realizó una rueda de confrontación mediante fotografía y que seleccionó a los candidatos con características similares al sospechoso.[297] Añadió que dicha rueda se realizó de esa forma debido a que la persona acusada no quería participar presencialmente para llevar a cabo una rueda de detenidos.[298] Testificó que, de acuerdo a su investigación, las personas que asesinaron a Andrés Lozada fueron Rosario Martínez y Jeffrey.[299]

A preguntas de la defensa, el agente Rosario Barreto declaró que tomó notas de todo lo que ocurrió la noche de los hechos.[300] Enfatizó que realizó un informe o bosquejo preliminar de la escena la misma noche de los hechos.[301] Añadió que en la parte del documento preparado, donde se hablaba del sospechoso del crimen,

---

[291] TPO, pág. 598.
[292] Íd., pág. 608.
[293] Íd., pág. 609.
[294] Íd., pág. 611.
[295] Íd., pág. 613.
[296] Íd., pág. 623.
[297] Íd., pág. 630.
[298] Íd., pág. 637.
[299] Íd., pág. 644.
[300] Íd., pág. 650.
[301] Íd., págs. 650-651.

no se colocó a nadie. [302] Atestiguó que, a pesar de recibir confidencias respecto al caso, no realizó un registro de confidencia, pues, al estas ser anónimas, no era necesario que apareciera en el documento.[303] A su vez, testificó que el acusado ya contaba con un historial criminal.[304]

Mientras la defensa contrainterrogaba al agente Rosario Barreto sobre la investigación realizada, el Ministerio Público objetó la referida línea de preguntas, fundamentándose en que era prueba de referencia.[305] En particular, el Ministerio Público expresó que la información que deseaba obtener la defensa, mediante la aludida línea de preguntas, fue provista por personas que no fueron incluidas como testigos.[306] Atendida la objeción, el Tribunal de Primera Instancia la declaró con lugar, permitiendo preguntas sobre la investigación del agente Rosario Barrero, mas no la información sobre las expresiones realizadas por las personas que no fueron incluidas como testigos por ser prueba de referencia.[307] La defensa no objetó ni realizó expresión alguna luego de la referida determinación del foro primario.

### Dr. Juan E. Méndez Cervera

El testimonió del doctor Juan E. Méndez Cervera (doctor Méndez Cervera) se limitó a establecer que atendió a Silva Flores el 29 de abril de 2019 en la sala de emergencias del Hospital la Concepción.[308] Sobre el cuadro clínico de Silva Flores, declaró que era uno grave. [309] En particular, describió que ella estaba "batallando entre la vida y la muerte".[310]

---

[302] TPO, págs. 655-656.
[303] Íd., págs. 659-660.
[304] Íd., pág. 721.
[305] Íd., págs. 745-746.
[306] Íd.
[307] Íd.
[308] Íd., págs. 815-834.
[309] Íd., págs. 820-821.
[310] Íd.

### Dr. Javier Gustavo Serrano

El doctor Javier Gustavo Serrano (doctor Serrano) fue patólogo forense en el Instituto de Ciencias Forense (ICF).[311] Su testimonio se circunscribió a establecer que había realizado la autopsia de Lozada Zapata el 12 de mayo de 2019.[312] En específico, testificó, además, que la muerte de Lozada Zapata fue causada por heridas de bala.[313] Describió, además, que el joven presentaba dos heridas de bala en la superficie corporal, una de estas ubicada en la parte posterior izquierda de la cabeza.[314]

### Carlos Juan Del Valle Arroyo

El perito Carlos Juan Del Valle Arroyo (Del Valle Arroyo) declaró que se dedicaba a examinar armas de fuego en el ICF.[315] Su testimonio se limitó a explicar en detalle el procedimiento de examinación de casquillos, proyectiles y sus derivados, así como la comparación microscópica de estos que preparó en el caso de Lozada Zapata.[316]

### Jerry Burgado De Jesús

El perito Jerry Burgado De Jesús (Burgado De Jesús) expresó que era un investigador forense en el ICF.[317] En lo pertinente, el testimonio de Burgado De Jesús se circunscribió a relatar que estuvo a cargo de la reconstrucción de la escena del 29 de abril de 2019 y de sus hallazgos.[318]

Culminando el desfile de prueba, el 17 de marzo de 2022, las partes se dirigieron a los miembros del jurado mediante sus informes finales.[319] Luego de culminados los informes, el Tribunal

---

[311] TPO, pág. 837.
[312] Íd., pág. 842.
[313] Íd., pág. 844.
[314] Íd., págs. 845-846.
[315] Íd., págs. 859-860.
[316] Íd., pág. 879.
[317] Íd., págs. 923-925.
[318] Íd., págs. 927-936.
[319] Véase, *Minuta* de *Continuación de Juicio por Jurado* del 17 de marzo de 2022 en los autos originales de los casos ISCR201900741(Tomo III), ISCR201900742, ISCR201900743, ISCR201900744, ISCR201900745 e ISCR201900747.

de Primer Instancia procedió a impartir las siguientes instrucciones al jurado: duda razonable; presunción de inocencia; prueba admitida por el tribunal; veredicto de culpabilidad y no culpabilidad; informe de la prensa; evidencia directa y circunstancial; credibilidad de los testigos; valor probatorio de los testimonios; identificación del acusado y la totalidad de las circunstancias; Regla 252.2 de Procedimiento Criminal, 34 LPRA Ap. II, R. 252.2; silencio del acusado; los peritos; evidencia con propósito ilustrativo; autor del delito; elementos de los delitos; asesinato en primer grado; Artículos 5.04, 5.11 5.15 y 6.01 de la Ley de Armas de 2000, *supra*; elementos subjetivos de la Ley de Armas de 2000, *supra*; y unanimidad del veredicto. Así, pues, impartidas las referidas instrucciones, el juez de instancia les preguntó a las partes si tenían algún planteamiento adicional. [320] Sin embargo, las partes señalaron que no tenían planteamiento adicional alguno.[321]

Sometido el caso por las partes, el jurado emitió un veredicto unánime de culpabilidad contra Rosario Martínez, en el caso ISCR201900741, por el Artículo 93 (d) del Código Penal de 2012, *supra*; en el caso ISCR201900742, por el Artículo 93 (d) del Código Penal de 2012, *supra,* en su modalidad de tentativa; en los casos ISCR201900743 y ISCR201900744, por el Artículo 5.04 de la Ley de Armas de 2000, *supra*; en el caso ISCR201900745, por el Artículo 5.15 de la Ley de Armas de 2000, *supra*; y en el caso ISCR201900748, por el Artículo 6.01 de la Ley de Armas de 2000, *supra.*[322] Por otro lado, el jurado rindió veredicto de no culpable contra Rosario Martínez, en el caso ISCR201900746, por el Artículo 5.15 de la Ley de Armas de 2000, *supra,* y en el caso

---

[320] TIJ, pág. 24.
[321] Íd. Cabe destacar que, de los alegatos de las partes surge que el 17 de marzo de 2022, la defensa solicitó la instrucción de asesinato en segundo grado.
[322] Véase, *Minuta* de *Continuación de Juicio por Jurado* del 17 de marzo de 2022, y las boletas del *Veredicto del Jurado,* en los autos originales del caso ISCR201900741 (Tomo III), ISCR201900742, ISCR201900743, ISCR201900744, ISCR201900745 e ISCR201900747.

ISCR201900748, por el Artículo 6.01 de la Ley de Armas de 2000, *supra*.[323]

Así las cosas, el 28 de junio de 2022, notificada el 13 de julio del mismo año, el foro primario dictó *Sentencia* mediante la cual condenó a Rosario Martínez a cumplir noventa y nueve (99) años de cárcel por el delito consagrado en el Artículo 93 (d) del Código Penal de 2012, *supra*, en el caso ISCR201900741; y veinte (20) años por el delito estatuido en el Artículo 93 (d) del Código Penal de 2012, *supra*, en la modalidad de tentativa, en el caso ISCR201900742, los cuales serían cumplidos de forma concurrente. Asimismo, condenó a Rosario Martínez a cumplir veinte (20) años de cárcel por el delito establecido en el Artículo 5.04 de la Ley de Armas de 2000, *supra*, en el caso ISCR201900743; veinte (20) años de cárcel por el delito dispuesto en el Artículo 5.04 de la Ley de Armas de 2000, *supra*, en el caso ISCR201900744; diez (10) años de cárcel por el delito definido en el Artículo 5.15 de la Ley de Armas de 2000, *supra*, en el caso ISCR201900745; y doce (12) años de cárcel por el delito estatuido en el Artículo 6.01 de la Ley de Armas de 2000, *supra*, los cuales serían cumplidos consecutivamente con las penas de los casos ISCR201900741 e ISCR201900742, para una pena total de ciento sesenta y un años (161).[324]

Inconforme, el 29 de julio de 2022, la parte apelante acudió ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

> Erró el Honorable Tribunal de Primera Instancia, en adelante, T.P.I., al no impartir las instrucciones del delito de asesinato en segundo grado, solicitado por la defensa.

---

[323] Surge de la *Minuta* de *Continuación de Juicio* por Jurado del 17 de marzo de 2022 y de los autos originales del caso ISCR201900741 (Tomo III), que el jurado declaró "no culpable" a Rosario Martínez en los casos ISCR201900746 e ISCR201900748.

[324] Véase, *Sentencia* del 28 de junio de 2022 del caso ISCR201900741, ISCR201900742, ISCR201900743, ISCR201900744, ISCR201900745 e ISCR201900747, en los autos originales del Tomo III del caso ISCR201900741.

Erró el T.P.I. en no impartir al jurado la instrucción sobre el testimonio del coautor.

Erró el T.P.I. al no permitir a la defensa contrainterrogar al [a]gente Julio Rosario en cuanto [a] aspectos que surgían de su investigación por ser prueba de referencia y no dar una instrucción de admisibilidad limitada.

Erró el T.P.I. al no impartir una instrucción especial al Jurado sobre no considerar evidencia ajena al caso.

Erró el T.P.I. al admitir en evidencia el croquis de la escena confeccionado por el Agte. Nelson González Quiñones.

Erró el T.P.I. al admitir en evidencia las identificaciones del sospechoso mediante fotografías. (Exhibits 23 y 24 del Ministerio Público).

Erró el T.P.I. al no impartir al jurado la instrucción respecto a la identificación del acusado de manera inmediata cuando surgieron las contradicciones respecto al *lineup* de fotografías.

Erró el T.P.I. al impartir una instrucción al Jurado sobre actos del acusado después del crimen o delito.

Tras varios incidentes procesales, el 24 de mayo de 2024, la parte apelante presentó su alegato suplementario. Por su parte, el 9 de septiembre del mismo año, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico, compareció mediante *Alegato de el [sic] Pueblo*.

Con el beneficio de la comparecencia de las partes, así como con la transcripción estipulada de la prueba oral, los autos originales y la prueba documental, nos disponemos a resolver el recurso que nos ocupa.

## II

## A

En nuestro ordenamiento jurídico, a toda persona acusada de delito le cobija una presunción de inocencia. La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico decreta que: "[e]n todos los procesos criminales, [la persona acusada] disfrutará del derecho a un juicio rápido y público, a ser

notificad[a] de la naturaleza y causa de la acusación recibiendo copia de esta, a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado [o abogada] y a gozar de la presunción de inocencia". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Es por ello que, el Estado es quien tiene el peso de la prueba. *Pueblo v. Negrón Ramírez*, 213 DPR 895 (2024); *Pueblo v. Toro Martínez*, 200 DPR 834 (2018); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

En respuesta a tal decreto, en los casos penales permea el principio fundamental de que se deben probar más allá de duda razonable todos los elementos del delito, su conexión con la persona acusada y la intención o negligencia criminal de esta. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Resto Laureano*, 206 DPR 963 (2021) (sentencia), citando a *Pueblo v. Toro Martínez*, supra.

Para determinar que la prueba controvierte la presunción de inocencia, esta debe ser suficiente y satisfactoria; es decir, que produzca certeza o convicción moral en el juzgador. *Pueblo v. Resto Laureano*, supra, pág. 967, citando a *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974). Tal exigencia no significa que el Ministerio Público deba presentar evidencia dirigida a establecer la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Feliciano Rodríguez*, 150 DPR 443, 447 (2000) (sentencia), citando a *Pueblo v. Cruz Granados*, 116 DPR 3, 21-22 (1984) (sentencia). Lo que se requiere es prueba suficiente, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Íd.*; *Pueblo v. García Colón I,* 182 DPR 129, 174-175 (2011).

En ese sentido, la prueba presentada por el Ministerio Público debe probar todos los elementos del delito y la conexión de la persona imputada con el referido delito. *Pueblo v. Negrón Ramírez,*

supra. Por tal razón, la carencia de prueba sobre alguno de los elementos del delito implicaría el incumplimiento por parte del Estado con su carga probatoria y supondría la absolución de la persona acusada respecto al delito imputado. *Íd.*

Por su parte, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, establece que la persona acusada se presumirá inocente. Además, dispone que, mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, esta será absuelta. Hay duda razonable cuando el juzgador siente insatisfacción con la prueba, una vez sopesados todos los elementos involucrados en el caso. *Pueblo v. Casillas, Torres,* 190 DPR 398 (2014).

Inicialmente, le corresponde al juzgador de hechos determinar si se satisfizo el estándar probatorio correspondiente y si, en su consecuencia, se probó la culpabilidad de la persona acusada más allá de duda razonable. *Pueblo v. Negrón Ramírez*, supra. Es decir, quien vendrá llamado a evaluar y aquilatar la evidencia presentada ante sí para determinar cuáles hechos han quedado probados o establecidos es el juzgador de los hechos. *Pueblo v. Toro Martínez*, supra, pág. 858; *Pueblo v. Acevedo Estrada,* 150 DPR 84, 98 (2000); *Pueblo v. Torres Rivera,* 137 DPR 630, 641 (1994). En casos criminales con derecho a juicio por jurado, esta función le corresponde al Jurado, el cual está constitucionalmente encomendado a recibir la prueba, adjudicar los hechos en base a esta y aplicar el derecho, según le instruya el tribunal. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Santa Vélez,* 177 DPR 61, 65-66 (2009); *Pueblo v. Negrón Ayala,* 171 DPR 406, 414 (2007).

En cuanto a la apreciación imparcial de la prueba, resulta harto conocido que la evaluación que de esta realicen los juzgadores de hechos merece respeto y confiabilidad. *Pueblo v. Resto Laureano*, supra, pág. 968. Por ello, las determinaciones de hechos probados

que haya hecho el juzgador primario no se deben descartar arbitrariamente, a menos que de la prueba admitida surja que no hay base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada*, supra, pág. 99. En ese sentido, "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146-147 (2020), citando a *Pueblo v. Toro Martínez*, supra, pág. 857. Dicha deferencia emana del hecho de que los juzgadores de instancia se encuentran en una mejor posición para evaluar, aquilatar y adjudicar la prueba presentada ante ellos. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Toro Martínez*, supra, págs. 857-858; *Pueblo v. García Colón I*, supra, pág. 165; *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). Lo anterior cobra mayor vigencia cuando se trata de la prueba testifical (oral) desfilada en el juicio. *Íd.* Ello debido a que son los juzgadores de hechos los que pueden oír y apreciar la forma de declarar de los testigos, así como su comportamiento. *Íd.*; *Pueblo v. Santia Rodríguez*, 129 DPR 49, 62-63 (1991).

Por tanto, en las causas de acción de naturaleza criminal, la deferencia ante la apreciación de los foros primarios solo cederá si ha mediado prejuicio, parcialidad o pasión, o si la prueba no concuerda con la realidad fáctica, resultare increíble o imposible. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Santiago et al.*, 176 DPR 133, 147-148 (2009). Debe entenderse, pues, que un Tribunal revisor solo podrá intervenir con las conclusiones de hecho del foro primario cuando la apreciación total de la prueba no represente su balance más racional, justiciero y jurídico. *Pueblo v. Resto Laureano*, supra, pág. 968, citando a *C y otros v. S.L.G. Ritch*, 176 DPR 951 (2009); *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 DPR 702, 714 (1990).

Si bien la determinación de si se probó la culpabilidad de la persona acusada más allá de duda razonable es un asunto de hecho y derecho revisable en apelación, nuestro esquema probatorio está revestido de deferencia a las determinaciones que los juzgadores de primera instancia hacen sobre la prueba testifical, ya sea un juez, una jueza o un panel de jurados. Esto, debido a que dicho foro está en mejor posición de aquilatarla. *Pueblo v. Resto Laureano*, supra, pág. 969. Véase, además, *Pueblo v. Rodríguez Pagán,* 182 DPR 239 (2011); *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454 (1988).

Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha manifestado que la deferencia debida a los foros de instancia se extiende tanto a la adjudicación de credibilidad que estos realizan sobre los testigos que declaran ante sí. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Toro Martínez*, supra, pág. 858; *Trinidad v. Chade,* 153 DPR 280, 291 (2001); *Pueblo v. Torres Rivera*, supra, págs. 640-641. Cuando coinciden asuntos sobre la suficiencia de la prueba y la deferencia en cuanto a la prueba testifical, debe evaluarse si la determinación de credibilidad del juzgador de hechos rebasó los límites de la sana discreción judicial. *Pueblo v. Resto Laureano*, supra, pág. 969. Al entrelazar estos principios, se ha establecido que podría revocarse un fallo condenatorio si de un análisis integral de la prueba los Foros revisores no quedan convencidos. *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 551.

**B**

De otra parte, toda persona acusada de delito grave o de un delito que apareje una pena de tal clasificación, le asiste la máxima constitucional que provee para que sea procesada en un juicio por un jurado imparcial. Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1; *Pueblo v. Agudo Olmeda,* 168 DPR 554 (2006). El juicio por jurado implica que la culpabilidad, o no culpabilidad de la persona

imputada, será determinada por un grupo representativo de la comunidad, luego de que, quien presida el proceso, le instruya sobre la norma jurídica aplicable a los hechos que considera. *Pueblo v. Negrón Ayala,* 171 DPR 406 (2007); *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299 (1991); *Pueblo v. Laboy,* 110 DPR 164 (1980). La función del jurado estriba en alcanzar un veredicto libre de coerción, consistente, a su vez, con la ley y las particularidades del caso. *Pueblo v. Negrón Ayala,* supra*; Pueblo v. González Colón,* 110 DPR 812 (1981); *Pueblo v. Rosario Centeno,* 90 DPR 874 (1964); Véase, además, J. M. Farinacci Fernós, *La Carta de Derechos*, San Juan, Editorial de la Universidad Interamericana de Puerto Rico, 2021, pág. 211 y; E. Batista Ortíz, *El Jurado: su función, características y propósitos*, 3ra ed., San Juan, Ed. SITUM, 2007, pág. 1.

Para que los miembros del jurado ejerzan con corrección y propiedad la responsabilidad que les es encomendada, resulta imperativo que se le transmitan todos los elementos de juicio que deben considerar previo a disponer sobre la relación de la persona acusado en el asunto. En ese sentido, las instrucciones al jurado se perfilan como mecanismo mediante el cual estos advienen al conocimiento efectivo del derecho aplicable al caso. *Pueblo v. Rodríguez Vicente,* 173 DPR 292 (2008). Su propósito es ilustrar y familiarizar a los miembros de este cuerpo con las normas básicas de ley en las cuales deben fundamentar su veredicto. El estado de derecho exige que las instrucciones que el juez o jueza imparta al jurado sean correctas, claras, precisas y lógicas. *Pueblo v. Acevedo Estrada,* 150 DPR 84 (2000); *Pueblo v. Echevarría Rodríguez I,* supra*; Pueblo v. Andrades González,* 83 DPR 849 (1961). En consecución de este principio, la Regla 137 de Procedimiento Criminal, 34 LPRA Ap. II, R. 137, dispone que:

> [t]erminados los informes, el tribunal deberá instruir al jurado haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias

para la información del jurado. Por estipulación de las partes, hecha inmediatamente antes de empezar las instrucciones y aprobada por el tribunal, se podrá omitir hacer el resumen de la evidencia. Todas las instrucciones serán verbales a menos que las partes consintieren otra cosa. Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones, al terminar el desfile de la prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que [e]stas informen al jurado. Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular [e]stas fuera de la presencia del jurado. El tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o trasmitiendo cualquier instrucción adicional que estimare pertinente. Al terminar las instrucciones el tribunal nombrará al presidente del jurado y ordenará que el jurado se retire a deliberar. En sus deliberaciones y veredicto el jurado vendrá obligado a aceptar y aplicar la ley según la exponga el tribunal en sus instrucciones.

En el ánimo de traer a su atención los hechos esenciales ventilados en sala, como norma, el juez o la jueza debe resumir la prueba desfilada, para evitar que cuestiones irrelevantes en el asunto se consideren al momento de su resolución final, todo sin apartarse de la prueba presentada y admitida en juicio y sin dar más énfasis a un evento que a otro. *Pueblo v. Acevedo Estrada,* supra; *Pueblo v. Echevarría Rodríguez I,* supra*; Pueblo v. Rodríguez Esmurria,* 90 DPR 532 (1964).

Con relación al ámbito normativo, la instrucción impartida al jurado debe proveer para que se cubran todos los elementos esenciales del delito imputado, así como los de aquellos inferiores comprendidos en el mismo y todos los aspectos de derecho que, bajo cualquier teoría razonable, resulten ser pertinentes a las deliberaciones, aunque la prueba de la defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. Rosario,* 160 DPR

592 (2003); *Pueblo v. Acevedo Estrada,* supra; *Pueblo v. Miranda Santiago,* 130 DPR 507 (1992); *Pueblo v. Bonilla Ortiz,* 123 DPR 434 (1989). Por su parte, el profesor Chiesa Aponte señala que el juez o la jueza tiene discreción para denegar la instrucción si estima que el derecho penal sustantivo no la sostiene. E. L. Chiesa Aponte, *Procedimiento Criminal y La Constitución: Etapa Adjudicativa*, San Juan, Ed. SITUM, 2018, pág. 503. Por tanto, si la evidencia resulta insuficiente en derecho para establecer la comisión del delito, el juez o la jueza podrá denegar la instrucción. *Pueblo v. Negrón Ayala*, supra, pág. 415. La solicitud de la instrucción será evaluada de la manera más favorable para la persona acusada. Chiesa Aponte, *op. cit.*, pág. 503. Igualmente, la falta de transmisión de una instrucción específica puede quedar subsanada si las instrucciones generales impartidas por el juez o la jueza a los miembros del jurado cubren sustancialmente el punto objeto de la instrucción solicitada. *Pueblo v. Negrón Vélez*, 96 DPR 419, 413 (1968).

En cuanto a los delitos inferiores comprendidos en el delito imputado, el Tribunal Supremo de Puerto Rico ha establecido que estas no se impartirán de forma automática, sino que es necesario que exista evidencia sobre la cual el jurado pueda inferir razonablemente que la persona acusada es culpable del delito inferior. *Pueblo v. Negrón Ayala,* supra. "Aun cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte". *Pueblo v. Serbiá,* 75 DPR 394, 398 (1953). Así, pues, el fundamento para impartir la instrucción al jurado sobre un delito menor incluido estriba en que esté apoyada en prueba que así la justifique. *Íd.*

La prueba que justifica la instrucción para el delito menor incluido es aquella que "de ser creída por el jurado, sería suficiente como cuestión de derecho penal sustantivo, para que [la persona] acusad[a] prevalezca". *Pueblo v. Negrón Ayala,* supra. El juez o la

jueza no debe aquí hacer juicio de credibilidad alguno para no impartir la instrucción, pues estaría usurpando funciones del jurado, en violación al derecho constitucional de la persona acusada a juicio por jurado. *Pueblo v. Negrón Ayala*, supra, págs. 415–146, citando a E. L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1992, Vol. II, pág. 332.

Por igual, los miembros del jurado deben ser adecuadamente advertidos sobre la carga probatoria requerida para establecer la comisión del delito objeto del procedimiento, así como la forma de culpabilidad exigida, a saber, el aspecto de intención o de negligencia, según sea el caso, puesto que deben determinar la presencia de los elementos subjetivos de la parte actora. *Pueblo v. Rosario,* supra*; Pueblo v. Bonilla Ortiz,* supra*.*

Ahora bien, consideraciones relativas a la uniformidad en la administración de la justicia y al ideal de minimizar todo grado de error posible en las instrucciones que se transmiten a los miembros del jurado, fundamentan la doctrina que establece que, la mejor práctica de los tribunales de instancia es basar sus instrucciones en el *Manual de Instrucciones al Jurado*. *Pueblo v. Mangual Hernández*, 111 DPR 136 (1981). Lo anterior también fomenta a que los miembros del jurado no queden expuestos a instrucciones largas o repetitivas, y sí a aquellas que se ajusten a la ley. *Pueblo v. Velázquez Caraballo,* 110 DPR 369 (1980).

Igualmente, nuestro Tribunal Supremo ha resuelto que "es tardío un planteamiento en apelación impugnando las instrucciones del juez [o la jueza] al jurado cuando la defensa no objeta dichas instrucciones ni solicita instrucciones adicionales". *Pueblo v. Romero Cuesta*, 101 DPR 404, 408 (1973), citando a *Pueblo v. Torres Rolón*, 99 DPR 970 (1971). Incluso, si no objeta de carácter general las instrucciones transmitidas, se renuncia a los errores que no lesionen derechos fundamentales. *Pueblo v. Del Valle*, 91 DPR 174

(1964). Por tanto, la falta de objeción por las instrucciones generales crea una presunción de corrección a favor de estas. *Pueblo v. Jiménez Hernández,* 116 DPR 632, 638 (1985). Sin embargo, "si la instrucción tuviera el efecto de lesionar derechos fundamentales [de la persona] acusad[a], puede levantarse como error en apelación a pesar de no haberla objetado oportunamente". *Pueblo v. Echevarría Rodríguez I,* supra, pág. 346.

Por último, la revocación por la falta de instrucciones solo se justifica si: (1) la instrucción omitida es correcta; (2) esta no ha sido cubierta en otras instrucciones impartidas; y (3) la omisión priva seriamente a la persona acusada de una defensa efectiva. *Pueblo v. Sáenz Forteza,* 100 DPR 956, 963 (1972).

**C**

De conformidad con lo expresamente estatuido en el Artículo 92 del Código Penal de 2012, 33 LPRA sec. 5141, el delito de asesinato se define como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". El elemento objetivo del delito de asesinato es dar muerte a un ser humano; mientras que el elemento subjetivo, es cuando la persona actúa a propósito, con conocimiento o temerariamente. D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado,* 4ta ed. rev., San Juan, SITUM, 2019, págs. 149-150. Asimismo, el Artículo 22 (1)(a) del Código Penal de 2012, 33 LPRA sec. 5035(1)(a), señala que, "una persona actúa 'a propósito' cuando su objetivo consciente es la producción de dicho resultado". A su vez, una persona actúa con conocimiento "cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta". 33 LPRA sec. 5035(2)(a). De otra parte, una persona actúa temerariamente "cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado o la circunstancia prohibida por ley". 33 LPRA sec. 5035(3).

Según la profesora Dora Nevárez Muñiz, la Ley Núm. 246-2014 que enmendó el Código Penal de 2012, relajó los requisitos para probar el asesinato en primer grado, puesto que se sustituyó el elemento de premeditación y deliberación por los elementos de "a propósito" o "con conocimiento". Nevares Muñiz, *op. cit.*, págs. 153-155; Véase, además, F. M. Pacheco Camacho, *Enmiendas al Código Penal 2012: Cambios al Elemento de Intención Criminal*, 55 Rev. Der. P.R. 41 (2015). En ese sentido, bajo el elemento de deliberación y premeditación se requería que el acto fuera pensado de antemano, es decir, que se llegara a la intención de matar luego de alguna consideración. *Pueblo v. Concepción Guerra*, 194 DPR 291, 305 (2015). Sin embargo, no era necesario un intervalo de tiempo determinado entre la intención de matar y el acto de matar, por lo que el delito de asesinato en primer grado podía formarse sin la deliberación del acto. *Íd.* De este modo, con los elementos de "a propósito" o "con conocimiento", ya no es necesario probar la deliberación previa a la resolución de matar. Nevares Muñiz, *op. cit.*; F. M. Pacheco Camacho, *supra*. Ante ello, se hace más comprensible la instrucción que se imparta al jurado sobre el elemento mental. *Íd.*

Las siguientes conductas eran parte de la modalidad de premeditación bajo el Artículo 83 del Código Penal de 1974, la cual no es necesaria probar actualmente: inferirle heridas punzantes a la víctima por la espalda; apuñalar al occiso mientras lo agarra; ultimar a balazos a la víctima luego de que esta le dijera a la persona acusada que no le disparara; dispararle al occiso con un arma de fuego y luego acercarse para dispararle más y decirle "para acabar contigo"; dispararle a una persona sin mediar palabras. Véase, *Pueblo v. Dingui Ayala*, 103 DPR 528 (1975); *Pueblo v. Garay*, 105 DPR 86 (1976); *Pueblo v. Torres Montañez*, 106 DPR 125 (1977); *Pueblo v. Guzmán Toro*, 107 DPR 700 (1978); *Pueblo v. Caballero*

*Rodríguez,* 109 DPR 126 (1979); *Pueblo v. Velázquez Caraballo,* supra.

A tenor con la conducta antes descrita y a fin de exponer los grados de asesinato reconocidos en nuestro ordenamiento penal, el Artículo 93 del Código Penal de 2012, 33 LPRA sec. 5142 (d), reza como sigue:

Constituye asesinato en primer grado:

[…]

(d) Todo asesinato causado al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado.

Asimismo, el Artículo 93 del Código Penal de 2012, *supra,* también dispone que: "Toda otra muerte de un ser humano causada temerariamente constituye asesinato en segundo grado".

**D**

El Código Penal de 2012 establece en el Artículo 43 que las personas responsables de los delitos son los autores, los cuales pueden ser personas naturales o jurídicas. 33 LPRA sec. 5066. Dicho estatuto añade en el Artículo 44 que se consideran autores:

(a) Los que toman parte directa en la comisión del delito.

(b) Los que solicitan, fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.

(c) Los que se valen de una persona inimputable para cometer el delito.

(d) Los que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo.

(e) Los que se valen de una persona jurídica para cometer el delito.

(f) Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica.

(g) Los que a propósito ayudan o fomentan a que otro lleve a cabo conducta que culmina en la producción de un resultado prohibido por ley, siempre que actúen con el estado mental requerido por el delito imputado con relación al resultado. 33 LPRA sec. 5067.

El precitado Artículo 44 del Código Penal de 2012, *supra*, copió el texto del Artículo 43 del Código Penal de 2004. Nevares Muñiz, *op. cit.*, pág. 89. Así, pues, interpretando la autoría bajo el Código Penal de 2004, nuestro Tribunal Supremo ha señalado que existen tres modalidades de autoría, a saber: (1) la autoría directa; (2) la autoría mediata y; (3) la coautoría. *Pueblo v. Torres Feliciano*, 201 DPR 63, 84 (2018). En ese sentido, es necesaria la participación material para realizar el delito, de tal modo que esta sea considerada un paso significativo para el resultado de este. *Íd.* "Lo determinante de la coautoría es que varias personas tienen el codominio del hecho delictivo en virtud del acuerdo de distribución de funciones, por lo que asumen igual responsabilidad penal al consumarse el delito". *Íd.*, pág. 85. Igualmente, no será considerada autora la persona que se opone desde el inicio a la comisión del delito y quien, sin saberlo, participa de la comisión de este. *Pueblo v. Santos Ortiz*, 104 DPR 115 (1975); *Pueblo v. Sustache Sustache*, 176 DPR 250, 301 (2009). Por tanto, será necesario establecer algún grado de consejo, incitación o participación directa o indirecta en la comisión del delito. *Pueblo v. Sustache Sustache*, supra.

Asimismo, es necesario que se pruebe más allá de duda razonable que la persona participó en la comisión del delito. *Pueblo v. Lebrón Morales*, 115 DPR 113, 116 (1984). Así, la mera presencia del testigo en la comisión del delito no es suficiente para justificar una condena. *Pueblo v. Agosto Castro*, 102 DPR 441, 444-445 (1974). Igualmente, "[e]l hecho de que una persona se entere que va a cometerse un delito y no dé cuenta de ello no la convierte en cómplice". *Íd.*, pág. 445. Solo si se combina la presencia con un acto

que facilite la comisión del delito, puede castigarse como participación. Chiesa Aponte, o*p. cit.*, pág. 198.

Por su parte, en nuestro ordenamiento jurídico, el testimonio de la persona coautora que se utiliza contra una persona acusada no tiene que ser corroborado. *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299, 317 (1991). Este testimonio será regido por lo establecido en la Regla 156 de Procedimiento Criminal, *supra*, que señala que:

> El testimonio de un coautor o del cooperador será examinado con desconfianza y se le dará el peso que estime el juez o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso. En los casos celebrados por jurado se le ofrecerán al jurado instrucciones a esos efectos. 34 LPRA Ap. I, R. 156.

La función de esta norma es orientar al juzgador de los hechos con respecto al valor probatorio que deberá brindarle a este testimonio en particular. Es decir, atenuar su valor del testimonio de la persona coautora debido a la naturaleza particular de dicho testimonio. *Pueblo v. Echevarría Rodríguez I,* supra, pág. 318.

**E**

Nuestro ordenamiento jurídico no permite hacer referencia a prueba no admitida durante el juicio a los miembros del jurado. *Pueblo v. Santiago González,* 97 DPR 99, 104 (1969). Permitir tal acto resultaría perjudicial para la persona acusada, salvo que se emitan advertencias o instrucciones por parte del juez o la jueza. *Íd.* No obstante, bajo determinadas circunstancias, tal actuación no podría ser subsanada por las instrucciones. *Íd.* Asimismo, "[e]l hecho de que [la parte] apelante no solicitase tales instrucciones no implica que las renunciase y que no pueda apuntar la cuestión ante nos[,] pues el error lesiona derechos sustanciales [de la persona] acusad[a]". *Íd.*, pág. 105.

**F**

Sabido es que, huir o fugarse luego de haber cometido un crimen, es prueba circunstancial que puede tomarse en cuenta al

determinar la culpabilidad de la persona acusada. *Pueblo v. Ortiz Rodriguez,* 100 DPR 972, 980 (1972). En ese sentido, la prueba de fuga será un elemento a evaluar en el conjunto total de la prueba. *Pueblo v. Báez Cintrón,* 102 DPR 30, 35 (1974). Será el juzgador de los hechos quien le otorgue el peso que merezca dicha prueba. *Pueblo v. Rosaly Soto,* 128 DPR 729, 750-751 (1991).

Asimismo, la huida o fuga, aun cuando sea tardía, constituye evidencia tendente a demostrar la culpabilidad de la persona acusada. *Pueblo v. Castro Rosario,* 125 DPR 164 (1990). No obstante, "[l]a prueba sobre huida, por sí sola, no es suficiente para establecer culpa; mas su pertinencia en conjunto con el resto de la prueba no puede ser cuestionada*". Pueblo* v. *Rosaly Soto,* supra, pág. 750.

**G**

Una persona imputada de delito debe ser conectada, más allá de duda razonable, como la responsable de la comisión de este. *Pueblo v. Hernández González,* 175 DPR 274, 289 (2009), citando a *Pueblo v. Rodríguez Maysonet,* 119 DPR 302 (1987). Por tanto, la identificación de una persona acusada se convierte en una de las etapas más críticas del proceso criminal, por lo que la admisión de evidencia viciada sobre la identificación constituye una violación del debido proceso de ley. *Íd.*

Existen diversos métodos para identificar a una persona sospechosa y relacionarla con el delito investigado. Véase, D. Nevares Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño,* 10ma ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2018, pág. 26. De este modo, las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, regulan la identificación de la persona acusada previo al juicio. En específico, la Regla 252.1 de Procedimiento Criminal, 34 LPRA Ap. II, R. 252.1, regula lo concerniente a los procedimientos en una rueda de detenidos (*lineup*). Por su parte, la Regla 252.2 de Procedimiento Criminal, 34

LPRA Ap. II, R. 252.2, dispone para los procedimientos de identificación mediante fotografía. No obstante, lo importante no es el método utilizado, sino que la identificación sea libre, espontánea y confiable. *Pueblo v. Torres Rivera*, supra, pág. 637.

La validez de la identificación de una persona sospechosa o acusada depende de la totalidad de las circunstancias particulares de cada caso, aun cuando el proceso haya sido sugestivo. *Pueblo v. Rodríguez Maysonet*, supra, pág. 309. De esta forma, se deberán evaluar los siguientes factores para determinar la confiabilidad de la identificación: la oportunidad que tuvo el testigo de observar a la persona ofensora al tiempo en que cometía el crimen, el grado de atención del testigo, el nivel de certeza demostrado por el testigo en la confrontación, y el tiempo transcurrido entre el crimen y la confrontación. *Pueblo v. Torres Rivera*, supra. La nerviosidad, la escasa luz y el tiempo son elementos de credibilidad a ser evaluados por el juzgador de los hechos. Véase, *Pueblo v. Figueroa Torres*, 102 DPR 76, 80-81 (1974). También, el Tribunal Supremo de Puerto Rico ha establecido que:

> [D]ebemos recordar que la 'presencia de sugestión no excluye irremisiblemente la prueba, sino que impone al jurado o al juez constituido en tribunal de derecho la labor de separar campos en el testimonio para determinar su confiabilidad y la existencia de prueba de identificación no influida ni maculada por conducta sugestiva'. *Pueblo v. Mattei Torres*, 121 DPR 600, 608 (1988), citando a *Pueblo v. Peterson Pietersz*, 107 DPR 172 (1978).

Igualmente, la "discrepancia en el aspecto físico [de la persona] acusad[a] al momento de los hechos y de la confrontación no afecta la admisibilidad de la identificación, sino que constituye un factor a considerarse por el juzgador para estimar el valor probatorio del testimonio del testigo durante el juicio". *Pueblo v. Mejías*, 160 DPR 86, 95 (2003). La determinación de dicha confiablidad tendrá todo el respeto y validez en el Foro apelativo. *Íd.*

En cuanto a la rueda de detenidos, la celebración de esta solo es aconsejable cuando la víctima o los testigos no conocen a la persona sospechosa. *Pueblo v. Robledo*, 127 DPR 964, 968 (1991). Se trata de un método valioso "para usarse cuando la confusión, el correr del tiempo, la difícil percepción, el recuerdo tenue, la inseguridad del testigo, o cualquier otro factor en evaluación lógica enerve la razonable certeza exigida de quien señala [la persona] autor[a] del delito". *Pueblo v. Suárez Sánchez*, 103 DPR 10, 19 (1974).

Por otro lado, en lo pertinente al caso ante nuestra consideración, la Regla 252.2 de Procedimiento Criminal, 34 LPRA Ap. II, R. 252.2, establece que:

(a) Los agentes y funcionarios del orden público podrán hacer uso de fotografías para identificar el posible autor de un acto delictivo únicamente en las siguientes circunstancias:

(1) Cuando por razones fuera del control de los agentes o funcionarios del orden público no fuere posible o necesario realizar una rueda de detenidos.

(2) Cuando no exista sospechoso del acto delictivo.

(3) Cuando existiendo un sospechoso [e]ste se negare a participar en la rueda, o su actuación o ausencia impidiese que la misma se efectúe adecuadamente.

(b) La utilización de fotografías como medio de identificación se regirá por las siguientes reglas:

(1) Se le mostrarán al testigo no menos de nueve (9) fotografías incluyendo la del sospechoso y [e]stas presentarán, en adición al sospechoso, personas de rasgos similares a [e]ste.

(2) Si dos o más testigos fueran a hacer la identificación fotográfica cada uno hará la identificación por separado

(3) En ningún caso se le sugerirá al testigo la persona que debe seleccionar, mediante la forma de llevar a cabo el procedimiento, por marcas en las fotografías, o cualquier otro medio.

(4) Celebrada la identificación fotográfica, si el testigo identificara el autor de los hechos

delictivos se procederá a levantar un acta que resuma brevemente el procedimiento seguido y se identificarán las fotografías utilizadas de manera que posteriormente pueda establecerse cuáles fueron las fotografías presentadas al testigo.

El método de identificación de una persona sospechosa o acusada mediante fotografías solo debe utilizarse en situaciones donde sea imperioso su uso. Véase, *Pueblo v. Suárez Sánchez*, supra, pág. 15. Igualmente, la validez del procedimiento de identificación mediante fotografías debe determinarse a la luz de las circunstancias particulares de cada caso. *Pueblo v. Vázquez*, 105 DPR 905, 908 (1977). Además, el Tribunal Supremo de Puerto Rico ha señalado que se debe respetar el procedimiento de identificación anterior al juicio mediante fotografías, salvo que se trate de una situación tan "impermisiblemente sugestiva que d[e] lugar a una irreparable identificación errónea". *Pueblo v. Torres*, 102 DPR 76, 79 (1974).

**H**

La *prueba de referencia* es definida como toda aquella "declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado". Regla 801(c) de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 801(c). Como regla general, este tipo de evidencia es inadmisible en los procesos judiciales. Regla 804 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 804.

Cuando se pretende utilizar prueba de referencia contra una persona acusada, se activa la protección constitucional del derecho a confrontación consagrado tanto en la Enmienda Sexta de la Constitución de los Estados Unidos, como en la Sección 11 de nuestra Constitución. Dicha protección constitucional no solo garantiza el derecho al careo, sino que también implica que cierta prueba de referencia, si es testimonial, será excluida a pesar de caer bajo alguna de las excepciones a la regla de exclusión codificadas en

las Reglas de Evidencia. *Crawford v. Washington*, 541 US 36 (2004); *Pueblo v. Guerrido López*, 179 DPR 950 (2010). El derecho a la confrontación recoge el principio fundamental de que se ponga a la persona acusada en posición de poder enfrentar a sus acusadores. *Pueblo v. Cruz Rosario*, 204 DPR 1040, 1048 (2020). Este derecho tiene tres (3) vertientes procesales: (1) derecho al careo o confrontación cara a cara con los testigos adversos; (2) derecho a contrainterrogar; y (3) derecho a excluir la prueba de referencia que intente presentar el Ministerio Público. *Íd.*; *Pueblo v. Pérez Santos*, 195 DPR 262, 269–270 (2016).

En otras palabras, es claro que dicha prueba de referencia lesiona el derecho que tienen las partes a confrontarse con la evidencia que se presente en su contra. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 DPR 1, 34-35 (1988). Sin embargo, cabe destacar que, si la parte adversa tiene o ha tenido la oportunidad de contrainterrogar a la persona declarante, se disipan los inconvenientes que trae consigo la prueba de referencia y la declaración realizada debe admitirse en evidencia. Véase, *Pueblo v. Santiago Colón,* 125 DPR 442, 449 (1990).

La regla de exclusión está esencialmente fundada en el hecho de que la misma no ofrece garantías circunstanciales de confiabilidad y exactitud. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra. El profesor Chiesa Aponte señala que la razón que motiva la regla general de exclusión de prueba de referencia es la falta de confiabilidad de la misma y su dudoso valor probatorio, puesto que, de ordinario, una declaración que constituye prueba de referencia no tiene las garantías de confiabilidad que se produce mediante un testimonio en corte. Un testimonio en corte se hace bajo juramento, frente a la parte perjudicada por la declaración, frente al juzgador que ha de aquilatar su valor probatorio y está sujeta al contrainterrogatorio de las partes que tengan a bien hacerlo. E. L.

Chiesa Aponte, *Tratado de Derecho Probatorio (Reglas de Evidencia de Puerto Rico y Federales)*, República Dominicana, Pubs. J.T.S., Tomo II, págs. 616-617.

Ahora bien, como todo principio general, el mismo no es absoluto, por lo que existen excepciones a la regla de exclusión de prueba de referencia y estas están reguladas por las Reglas 805 a la 809 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 805-809. Claro está, si ninguna de las circunstancias taxativamente enumeradas en los preceptos antes citados se configura, el foro de instancia deberá descartar la evidencia ofrecida.

## I

Los tribunales también pueden limitar el uso de la prueba ofrecida por las partes durante el juicio. A esos efectos, la Regla 107 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 107, establece que:

> Cuando determinada evidencia sea admisible en cuanto a una parte o para un propósito, y sea inadmisible en cuanto a otra parte o para otro propósito, el tribunal, previa solicitud al efecto, limitará la admisibilidad de esa evidencia a su alcance apropiado e instruirá inmediatamente sobre ello al jurado, de haberlo.

Así, pues, vemos que existen instancias en las cuales la prueba puede ser inadmisible para un propósito en particular debido a las limitaciones impuestas por nuestro estado de derecho. No obstante, conforme a la Regla 107 de Evidencia de Puerto Rico, *supra*, puede ser que esa misma evidencia, si es presentada u ofrecida para un propósito distinto al prohibido por nuestro ordenamiento jurídico, se pueda admitir de forma limitada. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4ta ed., San Juan, SITUM, 2015, pág. 91. Le corresponde a la parte con interés en la evidencia, solicitarle al Tribunal de Primera Instancia que limite la admisión de la misma al propósito para la cual sí es admisible. *Íd.*, pág. 116. Además, en la precitada Regla 107 se añadió el adverbio *inmediatamente*, en

relación con el momento de impartir la instrucción al jurado. E. L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, San Juan, SITUM, 2016, pág. 37. "Estos, en casos por jurado cuando el juez admite una evidencia para determinado fin probatorio, pero excluyéndola para otro fin, debe inmediatamente impartir la instrucción limitativa al jurado". *Íd.* También comenta el profesor Chiesa Aponte que "[n]o hay regla que permita la admisión de evidencia inadmisible". *Íd.*, pág. 39.

De otra parte, evidentemente, los tribunales se pueden equivocar al admitir prueba que no era admisible o excluir prueba que sí lo era. *Izagas Santos v. Family Drug Center*, 182 DPR 463, 483 (2011). En el primer caso, si una parte considera que el tribunal admitió evidencia erróneamente, deberá presentar una objeción oportuna, específica y fundamentada. Reglas 104, 105 y 106 de Evidencia de Puerto Rico, 32 LPRA Ap. V, R. 104-106. Así, una vez la parte afectada por la supuesta admisión errónea de evidencia demuestra que la objetó oportuna y correctamente, le corresponde al Tribunal Apelativo determinar si dicha admisión "fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita". *Pueblo v. Ruiz Bosch*, 127 DPR 762, 781 (1991). Puntualizamos que, incluso el admitir prueba de cargo "en violación a la regla de exclusión, no acarrea, sin más, revocación de una convicción, sino que puede resultar *harmless error*, esto es, error que no acarrea revocación". Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos,* Colombia, Vol I, *op. cit.*, pág. 295.

**J**

La citada regla establece que la parte perjudicada por la admisión errónea de evidencia puede presentar una moción para que se elimine del récord la aludida evidencia cuando el fundamento para objetar surge con posterioridad a la admisión. Regla 104 de Evidencia Puerto Rico, *supra.* Por otro lado, dicha regla contempla

el escenario en el cual el tribunal excluye erróneamente evidencia admisible. En particular, la Regla 104 de Evidencia de Puerto Rico, *supra*, establece que:

> [...]
>
> (b) Oferta de prueba.—En el caso de exclusión errónea de prueba, la parte perjudicada deberá invocar el fundamento específico para la admisibilidad de la evidencia ofrecida y hacer una oferta de prueba de forma que surja claramente cuál es la evidencia que ha sido excluida y la naturaleza, propósito y pertinencia para la cual se ofrece. No será necesario invocar tal fundamento específico ni hacer la oferta de prueba cuando resultan evidentes del contexto del ofrecimiento.
>
> El Tribunal permitirá la oferta de prueba y determinará si debe hacerse mediante un resumen de la evidencia ofrecida o el interrogatorio correspondiente. El tribunal podrá añadir cualquier manifestación que demuestre el carácter de la evidencia, la forma en que fue ofrecida, la objeción a su admisión y la resolución sobre la exclusión.
>
> [...]

De otro lado, la Regla 105 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 105, regula lo relacionado con el efecto en la admisión o exclusión de evidencia. En específico, dicha regla establece lo siguiente:

> (a) Regla general.—No se dejará sin efecto una determinación de admisión o exclusión errónea de evidencia ni se revocará por ello sentencia o decisión alguna a menos que:
>
> (1) La parte perjudicada con la admisión o exclusión de evidencia hubiere satisfecho los requisitos de objeción, fundamento u oferta de prueba establecidos en la Regla 104 de este apéndice, y
>
> (2) el tribunal que considera el señalamiento estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita.
>
> (b) Error constitucional.—Si el error en la admisión o exclusión constituye una violación a un derecho constitucional de la persona acusada, el tribunal apelativo s[o]lo confirmará la decisión si está convencido más allá de duda razonable que, de no haberse cometido el error, el resultado hubiera sido el mismo.

Es así como se permite, a la parte afectada por la admisión o exclusión de evidencia, poder apelar en su momento la determinación del foro de instancia. *Pueblo v. Santiago Irizarry*, supra.

A manera de excepción, la Regla 106 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 106, faculta a los Foros apelativos a atender un planteamiento de error sobre admisión o exclusión de evidencia y revocar una sentencia o decisión emitida por el tribunal, cuando la parte que se vería afectada por tal decisión no hubiera satisfecho los requisitos establecidos en la Regla 104 de Evidencia de Puerto Rico, *supra*, siempre y cuando:

(a) El error fue craso ya que no cabe duda de que fue cometido,

(b) el error fue perjudicial porque tuvo un efecto decisivo o sustancial en la sentencia o decisión cuya revocación se solicita, y

(c) el no corregirlo resulte en un fracaso de la justicia.

Con la normativa expuesta, procedemos a resolver el caso de autos.

**III**

En primer lugar, la parte apelante nos señala que el Tribunal de Primera Instancia incidió al no impartir instrucciones al jurado sobre el delito de asesinato en segundo grado. En particular, arguye que, de la prueba presentada en el juicio, no se demostró que hubiese deliberado y acudido al lugar de los hechos con la intención o el propósito de matar, según requerido por nuestro ordenamiento jurídico. No le asiste razón. Veamos.

Las instrucciones al jurado son el mecanismo mediante el cual estos advienen en conocimiento efectivo del derecho aplicable al caso.[325] Esta instrucción debe proveer al jurado para que se cubran todos los elementos esenciales del delito imputado, así como

---

[325] Véase, *Pueblo v. Rodríguez Vicente,* supra.

los de aquellos inferiores comprendidos en el mismo y todos los aspectos de derecho que, bajo cualquier teoría razonable, resulten ser pertinentes a las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad.[326] No obstante, las instrucciones sobre los elementos de delitos inferiores al imputado o comprendido en estos se harán siempre y cuando la prueba lo justifique. [327] Esto es así, pues nuestro Tribunal Supremo ha expresado que no se le transmitirá al jurado de manera automática instrucciones sobre delitos inferiores o comprendidos al imputado, si de la evidencia presentada el jurado no puede razonablemente inferir que la persona acusada es culpable de estos.[328]

Como mencionamos anteriormente, el delito de asesinato se define como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente".[329] El elemento objetivo del delito de asesinato es dar muerte a un ser humano; mientras que el elemento subjetivo, es cuando la persona actúa "a propósito", "con conocimiento" o "temerariamente". [330] El Artículo 93 del Código Penal de 2012, *supra*, establece que el asesinato en primer grado es "[t]odo asesinato causado al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado". Por otro lado, se considera asesinato en segundo grado toda muerte de un ser humano causada temerariamente.[331]

Sobre el elemento subjetivo del delito de asesinato, la tratadista Nevárez Muñiz ha expresado que, mediante la aprobación del Código Penal de 2012, *supra,* se relajaron los requisitos para probar el asesinato en primer grado, pues se sustituyó el elemento

---

[326] Véase, *Pueblo v. Rosario*, supra.
[327] Véase, *Pueblo v. Negrón Ayala*, supra.
[328] Íd.
[329] Véase, Artículo 92 del Código Penal de 2012, *supra.*
[330] Nevares Muñiz, *op. cit.,* págs. 149-150.
[331] Véase, Artículo 93 del Código Penal de 2012, *supra.*

de premeditación y deliberación por los elementos de "a propósito" o "con conocimiento".[332] A diferencia de los elementos de premeditación y deliberación, con los nuevos elementos del delito de asesinato en primer grado, ya no es necesario probar la deliberación previa a la resolución de matar, por lo que es más flexible a la hora de probar el elemento subjetivo.[333]

En el caso ante nuestra consideración, el apelante plantea que erró el foro sentenciador al no impartir instrucciones al jurado sobre el delito de asesinato en segundo grado, pues alega que, de la prueba presentada en el juicio, no se demostró que hubiese deliberado y acudido al lugar de los hechos con la intención o propósito de matar, como lo requiere el asesinato en primer grado. No le asiste razón. De la prueba presentada en el juicio a su fondo no se justificaba su impartición.

Según surge de los testimonios de González Ortiz, Torres Negrón y Rivera Torres estos estuvieron presentes al momento de los hechos, el 29 de abril de 2019 en horas de la noche. Se desprende que, mientras estos se encontraban en o cerca de la frontera con el apelante, recibieron información que había un vehículo frente al residencial El Recreo.[334] Del testimonio de estos surge, además, que el apelante estaba armado mientras ocurrieron los hechos;[335] que cuando llegaron al área donde se encontraba el auto, el apelante, junto a Jeffrey, abrieron fuego contra el vehículo en cuestión, donde se encontraba Silva Flores y Lozada Zapata, causándole la muerte a este último.[336] A raíz de la prueba presentada y corroborada por los testimonios desfilados, colegimos que la instrucción al jurado sobre el delito de asesinato en primer grado estaba justificada por la prueba desfilada. Esto es así, pues se presentó prueba sobre los

---

[332] Nevares Muñiz, *op. cit.,* págs. 153-155.
[333] Íd.
[334] Véase, TPO, págs. 161, 163-164, 345-346, 462-466.
[335] Íd., págs. 163, 462-463.
[336] Íd., págs. 187-188, 351-352, 465-469.

elementos del delito, en especial, el elemento subjetivo requerido para cometer el delito de asesinato en primer grado, es decir, "a propósito" o "con conocimiento". Recordemos que no procede hablar de premeditación ni deliberación, pues con los nuevos elementos del delito de asesinato en primer grado conforme, al Código Penal del 2012, *supra*, ya no es necesario probar la deliberación previa a la resolución de matar.

Por otro lado, contrario a lo propuesto por el apelante, no se justificaba la impartición de instrucciones sobre el delito de asesinato en segundo grado, pues no se desfiló prueba que llevara a un jurado a inferir razonablemente que el apelante cometió el delito de asesinato de manera temeraria. En conclusión, no se cometió el primer señalamiento de error.

Como segundo señalamiento de error, la parte apelante plantea que el Tribunal de Primera Instancia incidió al no impartir al jurado la instrucción sobre el testimonio del coautor. En específico, alega que las personas que testificaron en su contra (González Ortiz, Negrón Torres y Rivera Torres), tuvieron amplia participación criminal sobre los hechos, aunque ninguno fue acusado por el Ministerio Público.

Sabido es que en nuestro ordenamiento jurídico las personas responsables de los delitos son los autores.[337] El Tribunal Supremo de Puerto Rico ha señalado que existen tres modalidades de autoría, a saber: (1) la autoría directa; (2) la autoría mediata y; (3) la coautoría.[338] Se ha reconocido que lo determinante de la coautoría es que varias personas tienen el codominio del hecho delictivo en virtud del acuerdo de distribución de funciones, por lo que asumen igual responsabilidad penal al consumarse el delito.[339] El testimonio

---

[337] Véase, Artículo 43 de Código Penal de 2012, *supra*.
[338] Véase, *Pueblo v. Torres Feliciano*, supra.
[339] Íd.

del coautor está regulado por la Regla 156 de Procedimiento Criminal, *supra*, que establece que el mismo será examinado con desconfianza y se le dará el peso que estime el tribunal o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso. Por lo tanto, en los juicios celebrados por jurado se le ofrecerán instrucciones a esos efectos.

En el caso ante nos, la parte apelante plantea que el foro primario incidió al no impartir las instrucciones al jurado sobre el testimonio de coautor, pues en su contra testificaron personas que, según alega, tuvieron amplia participación criminal sobre los hechos delictivos ocurridos en el 29 de abril de 2019. Luego de un análisis sosegado de la transcripción de la prueba oral y del expediente que obra en autos, determinamos que el error señalado no se cometió, pues ninguno de esos testigos fue formalmente acusado por el Estado. Es decir, no fueron considerados coautores de los delitos imputados al apelante por parte del Ministerio Público. Tal hecho fue reconocido por la parte apelante en su escrito de *Apelación.* Cabe resaltar que la intervención de estos testigos se limitó a ser sospechosos de los hechos durante la etapa investigativa y fungir como testigos de cargo en el juicio. Del mismo modo, surge de la transcripción de la prueba oral del 17 de marzo de 2022, que el juez de instancia correctamente emitió instrucciones sobre la figura de autor y cooperador del delito.[340] En virtud de lo anterior, no se cometió el segundo señalamiento de error.

En su tercer planteamiento de error, la parte apelante señala que el foro de origen incidió al no permitirle a la defensa contrainterrogar al agente Rosario Barreto en cuanto a aspectos que surgían de su investigación, por entender que era prueba de

---

[340] TIJ, pág. 14.

referencia, y no dar una instrucción de admisibilidad limitada al jurado. Tampoco le asiste la razón. Veamos.

Según esbozamos, la Regla 801 de Evidencia de Puerto Rico, *supra,* establece que la prueba de referencia es toda aquella declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado. Como norma general, este tipo de evidencia es inadmisible en los procesos judiciales en Puerto Rico.[341] Como todo principio general, el mismo no es absoluto, por lo que existen excepciones a la regla de exclusión de prueba de referencia reguladas por las Reglas 805 a la 809 de Evidencia de Puerto Rico, *supra.* Por otro lado, cuando determinada evidencia sea admisible en parte o para un propósito, y sea inadmisible en cuanto a otra parte o para otro propósito, el Tribunal, previa solicitud al efecto, limitará la admisibilidad de esa evidencia a su alcance apropiado y deberá instruir inmediatamente sobre ello al jurado.[342]

En el caso ante nuestra consideración, mientras la defensa realizaba preguntas al agente Rosario Barreto sobre su investigación, el Ministerio Público objetó la referida línea de preguntas bajo el fundamento de prueba de referencia. Surge del expediente que el Ministerio Público expresó que la información que deseaba obtener la defensa mediante la aludida línea de preguntas fue provista por personas que no fueron incluidas como testigos, por tanto, era prueba de referencia. Atendidas las posturas de las partes, el Tribunal de Primera Instancia permitió que el agente Rosario Barreto declarara si entrevistó a otras personas, mas no permitió su testimonio en cuanto a la información o expresiones realizadas por las personas que no eran testigos de cargo.[343]

---

[341] Véase, Regla 804 de Evidencia de Puerto Rico, *supra.*
[342] Véase, Regla 107 de Evidencia de Puerto Rico, *supra.*
[343] Véase, TPO, págs. 745-746.

Examinado el expediente ante nos, colegimos que el foro primario no erró al impedirle a la defensa contrainterrogar al agente Rosario Barreto en cuanto aspectos que surgían de su investigación, pues la línea de preguntas de la parte apelante hacía referencia a información brindada por terceras personas que no formaron parte del juicio. Es decir, estamos ante prueba de referencia. En ese sentido, no era necesario que el foro sentenciador hiciera instrucción alguna al jurado respecto a la admisibilidad limitada conforme a la Regla 107 de Evidencia de Puerto Rico, *supra*, pues al ser prueba de referencia la información que pretendía adquirir la parte apelante sobre el agente Rosario Barreto es inadmisible, según en nuestro ordenamiento jurídico. Por consiguiente, el tercer señalamiento de error no se cometió.

En su cuarto señalamiento de error, la parte apelante indica que el foro primario erró al no impartir una instrucción especial al jurado sobre no considerar evidencia ajena al caso. Alega que el agente Rosario Barreto testificó sobre el historial criminal del apelante. No le asiste la razón. Veamos.

Sabido es que no se permite hacer referencia a prueba no admitida durante el juicio, a los miembros del jurado.[344] Permitir tal acto resultaría perjudicial para el acusado, salvo que se emitan advertencias o instrucciones por parte del juez o la jueza.[345] No obstante, bajo determinadas circunstancias, dicha actuación no podría ser subsanada por las instrucciones.[346]

Surge de la transcripción de la prueba oral que el agente Rosario Barreto declaró sobre el historial criminal del apelante. En primer lugar, mientras declaraba sobre una conversación que sostuvo con el testigo Rivera Torres, este mencionó que el apelante

---

[344] Véase, *Pueblo v. Santiago González*, supra.
[345] Íd.
[346] Íd.

era uno de los más buscados en Puerto Rico. Ahora bien, la defensa no objetó dicho testimonio.[347] En segunda instancia, el agente Rosario Barreto, mientras era contrainterrogado por la defensa, reiteró que el apelante poseía historial criminal, pero, en esta ocasión, fue objetado oportunamente.[348] A pesar de lo anterior, el foro primario mientras impartía instrucciones al jurado, el foro primario expresó lo siguiente: "[c]omo les indiqué previamente, las manifestaciones, comentarios y argumentos vertidos por las partes durante el presente juicio no hacen ni constituyen prueba". Del mismo modo, el foro *a quo* indicó que: "[e]l jurado, tal como les he indicado también previamente, deberá decidir este caso únicamente a través de la presentada y admitida en el Tribunal".[349]

Tomando en consideración todo lo antes expuesto, concluimos que no se cometió el cuarto señalamiento de error. Resulta evidente que el Tribunal de Primera Instancia impartió instrucción al jurado sobre no considerar evidencia ajena al caso, por lo que las expresiones vertidas por el agente Rosario Barreto contra el apelante quedaron subsanadas por las instrucciones al jurado.

Por otro lado, como su quinto señalamiento de error, la parte apelante señala que el foro primario erró al admitir en evidencia el croquis de la escena del crimen, confeccionado por el agente González Quiñones.

Sobre el particular, la Regla 104 de Evidencia de Puerto Rico, *supra*, establece que la parte perjudicada por la admisión errónea de evidencia debe presentar una objeción a la misma de manera oportuna, correcta y específica. De no ser así, la Regla 105 de Evidencia de Puerto Rico, *supra*, dispone que no se dejará sin efecto

---

[347] Véase, TPO, pág. 596.
[348] Íd., pág. 721.
[349] Véase, TIJ, págs. 4-5, 7.

una determinación de admisión errónea de evidencia ni se revocará por ello sentencia alguna, a menos que la parte promovente hubiese satisfecho el requisito de objeción plasmado en la Regla 104 de Evidencia de Puerto Rico, *supra*, y el tribunal a quien se le haga el señalamiento sobre la evidencia admitida estime que fue un factor decisivo o sustancial en la sentencia emitida cuya revocación se solicita.

En el caso ante nuestra consideración, el agente González Quiñones declaró que había realizado un croquis el 29 de abril de 2019 del lugar donde fue asignado investigar.[350] Por su parte, el Ministerio Público presentó el referido documento como evidencia y la defensa manifestó lo siguiente: "[q]ue conste sin objeción de la defensa", por lo que fue admitido.[351] Del mismo modo, la defensa decidió no contrainterrogar al agente González Quiñones, pues entendía que era prueba acumulativa.[352]

Ante la falta de objeción y las manifestaciones realizadas por la defensa del apelante respecto a la admisión del croquis, es forzoso concluir que no se cometió el quinto señalamiento de error. La defensa de la parte apelante debió objetar la admisión del croquis de manera oportuna, correcta y específica. Sin embargo, ello no ocurrió en este caso, pues la defensa optó por respaldar la admisión del croquis.

Como sexto señalamiento de error, la parte apelante plantea que el Tribunal de Primera Instancia incidió al admitir en evidencia las identificaciones del sospechoso mediante fotografías; específicamente las realizadas por los testigos Cruz Marrero y Torres Negrón. De otro lado, en su séptimo señalamiento de error, señala que el foro primario incidió al no impartir al jurado la instrucción

---

[350] Véase, TPO, pág. 402.
[351] Véase, TPO, pág. 403.
[352] Íd., pág. 414.

respecto a la identificación del acusado de manera inmediata cuando surgieron las contradicciones respecto a la identificación mediante fotografías. Debido a que ambos señalamientos de error están relacionados entre sí, procedemos a discutirlos de manera conjunta.

Según reseñáramos, la identificación de una persona acusada se convierte en una de las etapas más críticas del proceso criminal, por lo que la admisión de evidencia viciada sobre la identificación constituye una violación del debido proceso de ley.[353] En nuestro ordenamiento jurídico, las Reglas de Procedimiento Criminal permiten diversas formas de identificar a un sospechoso, entre ellas se encuentra la identificación por fotografía. Cabe destacar que lo importante no es cuál método se utiliza, sino que la identificación sea libre, espontánea y confiable.[354] La validez de la identificación de un sospechoso o acusado depende de la totalidad de las circunstancias particulares de cada caso, aun cuando el proceso haya sido sugestivo. [355] La validez del procedimiento de identificación mediante fotografías debe determinarse a la luz de las circunstancias particulares de cada caso.[356] Además, el Tribunal Supremo de Puerto Rico ha señalado que se debe respetar el procedimiento de identificación anterior al juicio mediante fotografías, salvo que se trate de una situación tan "impermisiblemente sugestiva que d[e] lugar a una irreparable identificación errónea".[357]

En el caso ante nos, el testigo Cruz Marrero declaró que, luego de los hechos, fue a la comandancia y le mostraron un *line up* de nueve fotografías, incluyendo la de Rosario Martínez para verificar

---

[353] Véase, *Pueblo v. Hernández González*, supra.
[354] Véase, *Pueblo v. Torres Rivera*, supra.
[355] Véase, *Pueblo v. Rodríguez Maysonet*, supra.
[356] Véase, *Pueblo v. Vázquez*, supra.
[357] Véase, *Pueblo v. Torres*, supra.

si lo reconocía y así lo hizo.[358] Aclaró que, cuando lo reconoció, circuló el número y puso sus iniciales. Además, especificó que tardó cinco (5) minutos para identificarlo.[359] Surge, a su vez, que expresó que las personas que estaban en las fotografías se parecían entre sí.[360] Por otro lado, el testigo Torres Negrón declaró que, cuando estaba en la comandancia, le mostraron un *line up* de fotografías, pero no pudo identificar a nadie.[361] Del mismo modo, señaló que sentía que lo estaban obligando.[362]

De la transcripción de la prueba oral se desprende, además, que, cuando los *line up* de fotografías mostrados a los testigos Cruz Marrero y Torres Negrón se admitieron como Exhibit 23 y 24, la defensa de la parte apelante no los objetó.[363]

En las instrucciones vertidas por el Tribunal de Primera Instancia, se estableció que corresponde exclusivamente a los miembros del jurado determinar la credibilidad de los testigos y el valor probatorio que le darán a los testimonios de cada testigo.[364] Por otra parte, el foro primario instruyó al jurado respecto a las identificaciones. Sobre este particular, expresó que deben tomar en cuenta, entre otras circunstancias que pudieran afectar la identificación, la capacidad y oportunidad que tuvo el testigo de observar a la persona que cometió el delito imputado, el estado de ánimo del testigo al momento de la observación, el tiempo que duró la observación, la distancia entre el testigo y la persona, la iluminación y las demás condiciones atmosféricas o visibilidad, entre otras.[365] Del mismo modo, expresó que debían tomar en consideración la certeza o falta de ella demostrada por el testigo en

---

[358] Véase, TPO, pág. 269.
[359] Íd., págs. 269-272.
[360] Íd.
[361] Íd., págs. 363-364, 368.
[362] Íd., pág. 364.
[363] Íd., pág. 423-424.
[364] TIJ, pág. 8.
[365] TIJ, pág. 11.

hacer la identificación.[366] Por último, el foro sentenciador instruyó a los miembros del jurado respecto a la identificación realizada por fotografías, conforme a la Regla 252.2 de Procedimiento Criminal, *supra*.[367]

En virtud de lo anterior, resolvemos que no se cometieron los señalamientos de error seis y siete. En primer lugar, surge de la transcripción de la prueba oral que la defensa del apelante no objetó conforme exige la Regla 104 de Evidencia de Puerto Rico, *supra*, la admisión de los *line up* de fotografías realizados a los testigos Cruz Marrero y Torres Negrón. Ello es suficiente para poder concluir que no se cometieron los errores señalados, pero la prueba y las instrucciones impartidas al jurado respaldan tal apreciación. Tras revisar la transcripción de prueba oral, no encontramos contradicciones respecto a la identificación del acusado por parte de la testigo Cruz Marrero. Del mismo modo, no surge de la evidencia desfilada en corte que lo anterior fuese una situación tan impermisiblemente sugestiva que diera lugar a la identificación errónea del apelante. A pesar de que el testigo Torres Negrón no pudo identificar mediante fotografía al apelante, surge de la transcripción de la prueba oral que este estuvo junto al apelante el día de los hechos. Por último, cabe destacar que, el foro primario mientras impartía las instrucciones a los miembros del jurado, dejó claro el derecho aplicable sobre la identificación y el método de identificación mediante fotografía, conforme el estado de derecho actual. Por lo tanto, no se cometieron los planteamientos de error seis y siete.

En su último y octavo señalamiento de error, la parte apelante señala que el Tribunal de Primera Instancia erró al impartirle una instrucción al jurado sobre actos del acusado después del crimen.

---

[366] TIJ, pág. 11.
[367] Íd., pág. 12.

En particular, arguye que el expediente está huérfano de prueba que muestre que el apelante se fugó inexplicablemente del lugar de los hechos. No le asiste la razón.

Fugarse luego de haber cometido un crimen es prueba circunstancial que puede tomarse en cuenta al determinar la culpabilidad de la persona acusada.[368] En ese sentido, la prueba de fuga será un elemento para evaluar en el conjunto total de la prueba, pero será el juzgador de los hechos, en este caso el jurado, quien le otorgue el peso que merezca dicha prueba.[369]

En el caso ante nuestra consideración, la parte apelante plantea que el foro primario erró al impartir instrucción al jurado sobre actos del acusado después del crimen, pues arguye que el legajo judicial está huérfano de evidencia de la fuga del apelante. Surge del testimonio vertido en juicio por los testigos González Ortiz, Torres Negrón y Rivera Torres, quienes estaban presentes al momento de los hechos, que luego de que el apelante y el individuo llamado Jeffrey terminaron de disparar al vehículo en cuestión, todos salieron corriendo de la escena.[370] Es decir, las personas que estuvieron presentes en los hechos ocurridos el 29 de abril de 2019 declararon que el apelante, luego de abrir fuego contra un vehículo, huyó del lugar. Esta prueba testimonial es evidencia suficiente para que el Tribunal de Primera Instancia impartiera al jurado, como hizo, instrucciones sobre los actos del apelante después del crimen.[371] Del mismo modo, resaltamos que la defensa de la parte apelante no objetó las referidas instrucciones realizadas por el foro *a quo* mientras fueron impartidas o luego de haber sido impartidas. Por tal razón, concluimos que el foro primario no erró al distribuir al

---

[368] Véase, *Pueblo v. Ortiz Rodríguez*, supra.
[369] Véase, *Pueblo v. Báez Cintrón*, supra; *Pueblo v. Rosaly Soto*, supra.
[370] Véase, TPO, págs. 169-171, 353-355, 471-472.
[371] Véase, TIJ, pág. 14.

jurado instrucciones sobre actos del apelante después del crimen pues de la prueba desfilaba en el juicio se justifica su impartición.

Estudiada cuidadosamente la transcripción de la prueba oral, examinados los autos originales, así como la prueba documental, y habiendo dado la debida consideración a los alegatos de las partes de epígrafe, procede confirmar los dictámenes apelados.

**IV**

Por los fundamentos que anteceden, confirmamos las *Sentencias* apeladas, en todos sus extremos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones